ATTORNEY FOR APPELLANT
J. Brad Voelz
Warsaw, Indiana

ATTORNEYS FOR APPELLEE
Gregory F. Zoeller
Attorney General of Indiana

J.T. Whitehead
Deputy Attorney General
Indianapolis, Indiana

# In the
# Indiana Supreme Court

No. 43S00-0810-CR-575

IAN J. CLARK,

*Appellant (Defendant below),*

v.

STATE OF INDIANA,

*Appellee (Plaintiff below).*

Appeal from the Kosciusko Circuit Court, No. 43C01-0705-FA-127
The Honorable Rex L. Reed, Judge

On Direct Appeal

**October 15, 2009**

**Shepard, Chief Justice.**

A jury found appellant Ian J. Clark guilty of murdering a two-year-old left in his care, and it recommended life in prison without parole, which the trial court imposed. Many of the grounds he urges as reasons for reversal were not preserved at trial. One of his trial objections does pose a novel question: should the trial court have permitted the State to offer into evidence Clark's entry from the social networking website MySpace? We hold that this electronic evidence was admissible, and we affirm Clark's conviction and sentence.

**Facts and Procedural History**

In May 2007 Ian J. Clark was living in Pierceton with his fiancée Matara Muchowicz and her daughter Samantha. Samantha typically stayed with a friend while Clark and Matara were at work, but Clark had been laid off at some point during the month and in an effort to save money Matara began leaving Samantha with Clark for the day.

When Matara arrived home on May 25th, around 2 p.m., she found Clark lying on the couch with Samantha on his chest, naked and blue. Matara approached the couch and noticed blood on the blanket that was covering up Clark. After being questioned about the blood, Clark sat up and then fell and stumbled into the coffee table, dropping Samantha on the ground. Clark told Matara that Samantha was breathing. Matara tried to wake Samantha, but she was cold. Samantha's head was thrown back and she was gurgling. Matara took Samantha and went to call 911. Clark told Matara to put the phone down and that Samantha was "brain dead" and then lit a cigarette and turned on the television.

Matara dialed 911, but Clark grabbed the phone out of her hand. Clark told Matara there was nothing wrong with Samantha and that she was breathing. He kept telling Matara that Samantha was fine. Matara told Clark they needed to call an ambulance. Clark continued to try to prevent Matara from calling 911. Clark took the phone from Matara and tried to drag her away from the phone. When Matara managed to dial 911 and ask the operator for help, Clark struck Matara in the back of the head with his fist.

Matara managed to make a second call to 911. Matara wanted to learn CPR because Samantha was not breathing. The 911 operators could hear Clark interrupt and disconnect the attempted calls. After completing the 911 call, Matara put a diaper on Samantha and went outside where she met a police officer.

The Kosciusko County sheriff's deputy who had arrived on scene tried to revive Samantha until paramedics arrived. The deputy noticed Samantha suffered a split lip, was limp, her jaw was crushed, and she had bruises all over her body. Paramedics were unable to revive

her. They observed that Samantha had bruises all over her body, her right jaw was swollen, black and blue, and she had blood around her mouth, and bruises on her chest area that resembled fingerprints. Later analysis put Samantha's time of death at 11 a.m to 12 noon.

The officers arrested Clark and transported him to the hospital with blood on his shirt. While waiting in an exam room with police, Clark told a detective that "I will f. . .ing kick your ass. I will send the Hell's Angels to kill you. F. . . it. It's only a C felony. I can beat this." (Tr. at 90.)

Police discovered diapers, tissues, a blanket, a shelf on the coffee table, a pillow and pajamas all stained red in the home. Police also discovered blood spatters near the sink and red spots near the door in the bathroom. They observed a hole in the bathroom wall, sixty-five inches from the floor, with bloodstains and brown hair embedded in it. (Tr. at 254–55, 258–259.) The blood and hair found in the hole was Samantha's. (Tr. at 258, 262.) The blood on Clark's shirt was Samantha's.

The list of injuries was appalling. Before Samantha's death she suffered multiple contusions, lacerations, abrasions and or deformities to her mouth, ear, chin, forehead, eyes, neck, jaw, shoulders, cheeks, arms, ribs, chest, back, scapula, kidney areas, areas over vital organs, abdomen, arm pits, nipples, temple, nose, lips, wrists, hands, orbits, buttocks, and thigh; her ulna was broken, her wrist was broken, her lung was bruised, her jaw was broken or dislocated; she had a subdural hematoma, intra-abdominal wounds, including a torn colon, an atlanto-occipital dislocation (her head was "ripped off her neck,"—the ligaments were disrupted from the spinal column so that only "tissue and skin" held it to the body), and cerebral contusions or bruising of her brain. (Tr. at 160, 279–84, 287, 298, 300, 310, 313, 318–36, 342–44, 356.)

Samantha suffered at least twenty separate injuries, more than one of which would be lethal, and she was still alive when she sustained many of them. An emergency room doctor described Samantha's "fresh" injuries as the worst he had observed in twenty years. (Tr. at 285, 287.) Neither one fall, nor multiple falls, nor multiple household accidents, could possibly have

caused Samantha's injuries.  The official cause of death was by multiple blunt force injuries and the official manner of death was ruled a homicide.

The State charged Clark with murder.  Clark withdrew his voluntary intoxication defense just before trial and withdrew his insanity defense during trial.  After the jury found him guilty of murder, the State and Clark stipulated to the single charged aggravator: that the victim was less than twelve years of age.  The jury recommended life without the possibility of parole, and the court sentenced Clark accordingly.

We have jurisdiction over this direct appeal under Ind. Appellate Rule 4(A)(1)(a) because a sentence of life without possibility of parole has been imposed under Ind. Code § 35–50–2–9 (2008).

## The MySpace Page

It seems that Matara had helped Clark create his own personal entry on MySpace, the social networking website.  Clark testified in his own defense, and the prosecutor read to Clark, over defense counsel's objection, his own description of himself:

> Society labels me as an outlaw and criminal and sees more and more everyday how many of the people, while growing up, and those who judge me, are dishonest and dishonorable.  Note, in one aspect I'm glad to say I have helped you people in my past who have done something and achieved on the other hand, I'm sad to see so many people who have nowhere.  To those people I say, if I can do it and get away.  B. . . sh. . . .  And with all my obstacles, why the f. . . can't you.

(Tr. at 466–68.)

Clark contends the trial court abused its discretion when it admitted evidence of his MySpace posting. (Appellant's Br. at 20–24.)  Clark claims this was inadmissible character evidence, citing Indiana Rule of Evidence 404(b), which provides in relevant part:

4

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, intent, preparation, plan knowledge, identity, or absence of mistake or accident.

(Appellant's Br. at 20–24.) Evidence is excluded under Rule 404(b) when it is introduced to prove the "forbidden inference" of demonstrating the defendant's propensity to commit the charged crime. Camm v. State, 908 N.E.2d 215 (Ind. 2009).

Otherwise inadmissible evidence may be admitted where the defendant opens the door to questioning on that evidence. Jackson v. State, 728 N.E.2d 147 (Ind. 2000). The door may be opened when the trier of fact has been left with a false or misleading impression of the facts.

We conclude that the trial court properly admitted the evidence of Clark's MySpace page. Clark's posting contained only statements about himself and in reference to himself. (Tr. at 465–469.) Thus, the State is right to observe that this is solely evidence of his own statements, not of prior criminal acts. It was Clark's words and not his deeds that were at issue, so Rule 404(b) does not apply.

It is only slightly more difficult to consider whether the MySpace entry was actually probative of any issue at trial. Clark testified that at most Samantha died because he was drunk and he was "reckless." (Tr. at 431–32.) Clark made his character a central issue, a reasonable defense strategy presumably aimed at obtaining a jury verdict on the lesser-included offense of reckless homicide. He testified on a number of occasions about his state of mind, suggesting his intent could only have been "reckless" and not criminal:

> Clark: I was negligent. I was reckless. I was irresponsible. I was an a. . . hole. Sorry but for a lack of a better word, but, yeah. That's what I am, but I'm not an intentional killer. I mean, I don't even know how to explain this, but there's a lot better ways to kill somebody that [sic] doing it like that. You know, there's no attempt to hide the crime. I didn't clean up anything. I didn't change clothes, mens rea. People do certain things when they kill somebody. They try to hide a crime. There's no evidence. No evidence whatsoever that I tried to hide anything. And the cops, they know that. They know that.

5

(Id.)

> State: You say, your conduct is reckless?
> Clark: Most definitely. That's what your evidence shows.

(Tr. at 469.)

> State: Well, why didn't you pick up the phone and call 911?
> Clark: Once again, I was incoherent. It's an issue of coherency. You asked me a question. Can I answer it?
> State: Sure, go ahead.
> Clark: Thank you sir. I mean, it's more or less common sense for the Jury. Let them figure it out, but the bottom line is your officers, oh, he's not drunk, he's not drunk, and your own tests say I am drunk. It's one of those issues where you guys are trying to make an issue out of something that simply is not an issue. You're making a murder charge out of a reckless homicide charge. I've told your office that over and over. I would plead guilty to reckless homicide. You're making an issue of it. You're attacking every little thing and you're looking pitiful in front of this Jury.
> State: Why would you plead guilty to reckless homicide if you didn't do anything?
> Clark: A reckless act that ends in the death of a human being is termed reckless homicide. I believe, through the evidence, and common sense, Mr. Hearn, that I am guilty of reckless homicide. I am not guilty of an intentional crime. And the evidence, one hundred percent, shows that.
> State: Well, reckless homicide is that you knowingly and intentionally committed an act and you're saying you're willing to admit to that?
> Clark: I'm guilty. I will answer this for you one more time, and then I won't answer your question if you pose it another way. So, get this straight. I'm guilty of a reckless act. Period.

(Tr. at 471–472.) Once Clark took the stand to testify along these lines, it was proper to permit the prosecution to confront Clark with his own seemingly prideful declarations that rebutted his defense. Clark's MySpace declarations shared much with his boast to the police after he killed Samantha: "It's only a C Felony. I can beat this." (Tr. at 90.)

6

**Hells Angels**

Clark asserts that the prosecutor committed misconduct in the course of the following exchange that occurred while Clark was on the stand:

State:    You have some familiarity with the Hells Angels, don't you?
Clark:    Absolutely. Absolutely. We could talk about that. I'm not scared of that at all.
State:    Alright. You're familiar with the Hells Angels code about hurting a baby?

(Tr. at 473.) Clark's lawyer objected, arguing the question was irrelevant and that the prosecutor was badgering the witness. The trial court sustained the objection on relevance grounds, and sustained the objection as it related to Clark's response ("No. No. No.") (Tr. at 473–474.) After the court sustained the objection, Clark declared, "Let's go. I'll answer it." (Tr. at 474.) The judge reminded Clark he had no questions before him and the State indicated it had no further questions. (Id.)

Clark put his character at issue during his direct testimony, and a detective had earlier testified that Clark had threatened the Hells Angels would do him harm. (Tr. at 174.) It was not unfair, therefore, to ask Clark about any familiarity he might have with the gang.

Furthermore, Clark's response when asked about his familiarity with the Hells Angels ("We could talk about that. I'm not scared of that at all.") led rather naturally to the State's follow-up question about the gang's code on hurting children. Even after the trial court sustained an objection by defense counsel, Clark insisted that he wanted to answer the question. (Tr. at 473–474.) A defendant may not take advantage of an invited error. Wright v. State, 828 N.E.2d 904, 907 (Ind. 2005).

Inasmuch as Clark seemed eager to discuss the subject and the court took such action as defense counsel requested, we see no error.

## Claims of Fundamental Error

Because the best way to assure a fair trial is to resolve potential errors while the trial is under way, we generally hold that a claim of error must be raised during trial in order to be available as an issue on appeal. We nevertheless sometimes entertain such claims under the rubric of "fundamental error." Fundamental error is an error that makes a fair trial impossible or constitutes clearly blatant violations of basic and elementary principles of due process presenting an undeniable and substantial potential for harm. Benson v. State, 762 N.E.2d 748, 755 (Ind. 2002). Fundamental error applies only when the actual or potential harm "cannot be denied." Id. at 756. An appellate court receiving contentions of fundamental error need only expound upon those it thinks warrant relief. It is otherwise adequate to note that the claim has not been preserved. Carter v. State, 754 N.E.2d 877, 881 (Ind. 2001). There are five such claims here.

A. Court Comment. Clark continually disrupted the trial with comments and interjections even when objections were sustained in his favor. (See Tr. at 274, 452, 456–59, 469–70, 473–74.) During the cross-examination of Clark by the prosecutor, Clark stated, "I'm not gonna talk to this [p]rosecutor any more. If you want to hold me in contempt of [c]ourt, you can do what you've got to do." (Tr. at 476–77.) The court responded by saying, "Well, I can do what I've got to do, but I think you're doing more than I could do." (Tr. at 477.)

B. Recklessness. In final instruction number 4, the court informed the jury that if the State failed to prove the Defendant committed murder, the jury may consider whether Clark committed reckless homicide, a class C felony, and accurately defined for the jurors the crime of reckless homicide. See Ind. Code § 35–42–1–5(2008). Clark contends the prosecutor engaged in misconduct by arguing to the jury that the lesser included offense of reckless homicide was more intended for deaths resulting from reckless driving.

C. State's Argument on Crime. Clark also claims the prosecutor asked the jury to convict him for reasons other than his guilt. He cites this part of final argument:

> This case is important because the issue in this case is, do the facts and evidence
> support the inference that the Defendant knowingly and intentionally committed

murder. And as this case goes through the Court process, it will be known as Ian Clark versus the State of Indiana. And as attorneys in the future read the case law and they read the case of the State of Indiana, or Ian Clark versus the State of Indiana, this case will stand for the proposition that this community and this State, will not tolerate what happened here. It will also stand for the proposition that this, these facts that are sufficient to support the inference that the Defendant knowingly or intentionally murdered Samantha. I'm asking you to find the Defendant guilty of murder. Thank you.

(Tr. at 534–35.) The trial court instructed the jurors that the presumption of innocence continues until the State has proven guilt beyond a reasonable doubt, that the jurors' decision must be based on the evidence, that neither sympathy nor bias should be allowed to influence the jurors' decision, and that their decision should rest "solely upon the law and the evidence, and without thought to the possible consequences." (App. at 278–280.)

D. Arguing an Uncharged Aggravating Circumstance? The State and Clark stipulated to the single charged aggravator that the victim was less than twelve years of age. See Ind. Code § 35–50–2–9(b)(12) (2008). The prosecutor argued in part to the jury:

When you consider whether or not the aggravating circumstances outweigh the mitigating circumstances, I want you to think about this. The Defendant had the responsibility to care for a two year old. I want you to consider the brutality of what he did. The torture that little Samantha endured. He took the life of a two year old child. I think it's ironic that at 11:30 on May 25th, 2007, Samantha lost her life. At 11:30 on today's date, you found him guilty of murder. Samantha had her whole life ahead of her, and the Defendant snuffed it out. As I told you, in my prior final argument, you can't render an injustice in this case. It's been awful. But what you can do is see that the Defendant doesn't commit it again. Keep the life that was all ahead for Samantha, he took it away from her. It's only fair that he spends the rest of his life in jail. Thank you.

(Tr. at 555.) The State's argument was primarily themed around the already stipulated aggravator of Samantha's young age, using the word torture (which had not been charged as an aggravator) only once in the entire argument.

E. Voir Dire. Clark had raised an insanity defense, so the prosecutor asked potential jurors questions about insanity. There were three instances in which the prosecutor asked some-

9

thing like, "Do you believe there are people in this society that are just evil," (Voir Dire Tr. at 40), and, "[d]o you think it's possible for somebody to be just evil and you understand there's a difference between being legally insane and evil?" (Voir Dire Tr. at 54.)

The foregoing events during trial did not constitute a "blatant violation of basic and elementary due process" making a fair trial impossible, the standard for fundamental error. <u>Benson</u>, 762 N.E. at 756.

## Conclusion

We affirm the conviction and sentence for murder.

Dickson, Sullivan, Boehm, and Rucker, JJ., concur.