## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 27 2017, 9:02 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Stephen T. Owens
Public Defender of Indiana

Kathleen Cleary
Deputy Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

J.T. Whitehead
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Ian J. Clark<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff* | February 27, 2017<br><br>Court of Appeals Case No.<br>43A03-1605-PC-970<br><br>Appeal from the Kosciusko Circuit Court<br><br>The Honorable Michael W. Reed, Judge<br><br>Trial Court Cause No.<br>43C01-0705-FA-127 |

**Mathias, Judge.**

[1]   Ian Clark ("Clark") appeals the Kosciusko Circuit Court's denial of his petition for post-conviction relief. Clark, who was convicted of murdering his

girlfriend's two-year old child, challenges the effectiveness of his trial and appellate counsel.

[2] We affirm.

## Facts and Procedural History

[3] The facts surrounding Clark's murder conviction are taken from our supreme court's resolution of Clark's direct appeal:

> In May 2007 Ian J. Clark was living in Pierceton with his fiancée Matara Muchowicz and her daughter Samantha. Samantha typically stayed with a friend while Clark and Matara were at work, but Clark had been laid off at some point during the month and in an effort to save money Matara began leaving Samantha with Clark for the day.
>
> When Matara arrived home on May 25th, around 2 p.m., she found Clark lying on the couch with Samantha on his chest, naked and blue. Matara approached the couch and noticed blood on the blanket that was covering up Clark. After being questioned about the blood, Clark sat up and then fell and stumbled into the coffee table, dropping Samantha on the ground. Clark told Matara that Samantha was breathing. Matara tried to wake Samantha, but she was cold. Samantha's head was thrown back and she was gurgling. Matara took Samantha and went to call 911. Clark told Matara to put the phone down and that Samantha was "brain dead" and then lit a cigarette and turned on the television.
>
> Matara dialed 911, but Clark grabbed the phone out of her hand. Clark told Matara there was nothing wrong with Samantha and that she was breathing. He kept telling Matara that Samantha was fine. Matara told Clark they needed to call an ambulance.

Clark continued to try to prevent Matara from calling 911. Clark took the phone from Matara and tried to drag her away from the phone. When Matara managed to dial 911 and ask the operator for help, Clark struck Matara in the back of the head with his fist.

Matara managed to make a second call to 911. Matara wanted to learn CPR because Samantha was not breathing. The 911 operators could hear Clark interrupt and disconnect the attempted calls. After completing the 911 call, Matara put a diaper on Samantha and went outside where she met a police officer.

The Kosciusko County sheriff's deputy who had arrived on scene tried to revive Samantha until paramedics arrived. The deputy noticed Samantha suffered a split lip, was limp, her jaw was crushed, and she had bruises all over her body. Paramedics were unable to revive her. They observed that Samantha had bruises all over her body, her right jaw was swollen, black and blue, and she had blood around her mouth, and bruises on her chest area that resembled fingerprints. Later analysis put Samantha's time of death at 11 a.m. to 12 noon.

The officers arrested Clark and transported him to the hospital with blood on his shirt. While waiting in an exam room with police, Clark told a detective that "I will f...ing kick your ass. I will send the Hell's Angels to kill you. F ... it. It's only a C felony. I can beat this."

Police discovered diapers, tissues, a blanket, a shelf on the coffee table, a pillow and pajamas all stained red in the home. Police also discovered blood spatters near the sink and red spots near the door in the bathroom. They observed a hole in the bathroom wall, sixty-five inches from the floor, with bloodstains and brown hair embedded in it. The blood and hair found in the hole was Samantha's. The blood on Clark's shirt was Samantha's.

The list of injuries was appalling. Before Samantha's death she suffered multiple contusions, lacerations, abrasions and or deformities to her mouth, ear, chin, forehead, eyes, neck, jaw, shoulders, cheeks, arms, ribs, chest, back, scapula, kidney areas, areas over vital organs, abdomen, arm pits, nipples, temple, nose, lips, wrists, hands, orbits, buttocks, and thigh; her ulna was broken, her wrist was broken, her lung was bruised, her jaw was broken or dislocated; she had a subdural hematoma, intra-abdominal wounds, including a torn colon, an atlanto-occipital dislocation (her head was "ripped off her neck,"—the ligaments were disrupted from the spinal column so that only "tissue and skin" held it to the body), and cerebral contusions or bruising of her brain.

Samantha suffered at least twenty separate injuries, more than one of which would be lethal, and she was still alive when she sustained many of them. An emergency room doctor described Samantha's "fresh" injuries as the worst he had observed in twenty years. Neither one fall, nor multiple falls, nor multiple household accidents, could possibly have caused Samantha's injuries. The official cause of death was by multiple blunt force injuries and the official manner of death was ruled a homicide.

The State charged Clark with murder. Clark withdrew his voluntary intoxication defense just before trial and withdrew his insanity defense during trial. After the jury found him guilty of murder, the State and Clark stipulated to the single charged aggravator: that the victim was less than twelve years of age. The jury recommended life without the possibility of parole, and the court sentenced Clark accordingly.

*Clark v. State*, 915 N.E.2d 126, 128-29 (Ind. 2009) (record citations omitted).

Clark's conviction and sentence were affirmed on direct appeal.

[4] Thereafter, Clark filed a pro se petition for post-conviction relief. The petition was amended by counsel on August 10, 2015, and an evidentiary hearing was held in January 2016.

[5] Clark's trial counsel was not available to testify at the hearing because he is deceased. His appellate counsel was available and testified concerning the choice of issues raised on direct appeal. Appellate counsel considered whether to raise certain unpreserved issues on direct appeal by arguing fundamental error[1] or whether to preserve the issue as one that might support a claim of ineffective assistance of counsel in a petition for post-conviction relief.

[6] On April 6, 2016, the trial court denied Clark's petition for post-conviction relief in an order containing detailed findings addressing Clark's claims of ineffective trial and appellate counsel. The order provides in pertinent part:

> THE COURT FINDS the Defendant/Petitioner alleged that he received ineffective assistance of appellate counsel, stating the following specific allegations: a) Appellate counsel failed to raise the issue of the State's amendment of the information for Murder, over objection of trial counsel, that occurred during the trial.; b) Appellate counsel failed to raise the issue of prejudice by the Defendant/Petitioner, as a result of the amendment of the information for murder during the trial, as it impacted his decision not to plead to a term of years prior to trial; and c)

---

[1] In addition to appealing certain Rule 404(b) evidence admitted at trial, Clark's appellate counsel unsuccessfully raised five claims of fundamental error. *Id.* at 132-33.

Appellate counsel failed to adequately raise the issue of improper use of the term evil by the State during the trial.

***

THE COURT FINDS that appellate counsel conducted legal research of issues, read all of Defendant/Petitioner's letters, and ultimately selected what he believed were the strongest issues, reserving some issues for Defendant/Petitioner to raise in a post-conviction proceeding where he felt that the burden of proof would be more favorable to Defendant/Petitioner.

THE COURT FINDS that appellate counsel considered the State's amendment of the information during trial as a potential issue; and to that end, appellate counsel reviewed the relevant statutes, as well as case law pertaining to the issue, in addition his other aforementioned work.

THE COURT FINDS that appellate counsel made a determination, based upon his understanding of the law and the facts of the case, that the issue of the amendment of the information was not stronger than the issues he ultimately raised on direct appeal.

THE COURT FINDS that under the circumstances of this case the amendment of the information was an amendment of form and not substance.

THE COURT FINDS that there is no probative evidence that had appellate counsel raised the issue of the amendment of the information, the outcome of the appeal would have been different.

THE COURT FINDS that the Defendant/Petitioner received notice of the statutory definition of murder, at least as early as February 25, 2008, when the Court provided counsel with the Court's Preliminary Instructions. The Court further finds that trial counsel had no objection to the Preliminary Instructions prior to the commencement of the trial.

THE COURT FINDS that the amendment of the information did not change the Defendant/Petitioner's defense that the Defendant/Petitioner was guilty of reckless homicide and not murder. The Court further finds that trial counsel began laying the foundation for the reckless homicide defense as early as voir dire, and never substantially deviated from that defense.

*** 

THE COURT FINDS that appellate counsel made a strategic decision to raise three references by the State of the term "evil" during voir dire. The Court further finds that appellate counsel made the conscious decision to not raise more references to the term "evil", because trial counsel also used the term several times to explain legal concepts to the potential jurors.

THE COURT FINDS that there is no probative evidence that the references to "evil", by both the State and trial counsel, had any prejudicial effect on the jurors ultimately chosen to hear the case. In addition, there is no probative evidence that the references to evil in voir dire, prevented Defendant/Petitioner from receiving a fair trial.

THE COURT FINDS that there is no probative evidence that, had appellate counsel presented the additional references of "evil", the outcome of the direct appeal would have been different.

***

THE COURT FINDS that the Defendant alleged that he received ineffective assistance of trial counsel for the following reasons: a) Trial counsel failed to withdraw the insanity defense prior to the commence of the trial; b) Trial counsel did not adequately preserve for appeal the issue of the amendment of the information by the State during the trial; and c) Trial counsel failed to object to alleged prosecutorial misconduct during the State's rebuttal argument; specifically to the State's characterization of reckless homicide, and the State's alleged mischaracterization of evidence of intoxication.

***

THE COURT FINDS that trial counsel vigorously defended Defendant/Petitioner through the filing of pretrial motions for discovery, conducting depositions of witnesses, the filing of a Notice of Mental Disease or Defect [an insanity defense], filing of a motion to appoint an expert witness in the field of toxicology, filing motions to suppress, filing a memorandum in support of his motions to suppress and motion in limine, filing proposed final instructions and interposing numerous objections during the trial.

THE COURT FINDS that trial counsel's decision not to withdraw the insanity defense was not necessarily unreasonable, where the defense presented was based upon a diminished mens rea due to defendant's self-described recklessness conduct and his intoxication.

THE COURT FINDS that trial counsel's decision not to withdraw the insanity defense was most likely strategic, as the Defendant/Petitioner was prone to, and did display erratic behavior on the witness stand.

THE COURT FINDS that trial counsel's decision not to object to the State's analysis of reckless homicide was most likely strategic. The Court further finds that trial counsel also used driving behavior to explain recklessness to the jury in voir dire.

THE COURT FINDS that the Defendant/Petitioner during his trial testimony told the jury that he was "guilty of reckless homicide." The Court further finds that Defendant/Petitioner further stated, "I'm guilty of a reckless, drunken, negligent act." Tr. 472.

THE COURT FINDS that the evidence of the injuries suffered by Samantha Muchowicz was appalling. Before Samantha's death she suffered multiple contusions, lacerations, abrasions and or deformities to her mouth, ear, chin, forehead, eyes, neck, jaw, shoulders, cheeks, arms, ribs, chest, back, scapula, kidney areas, areas over vital organs, abdomen, arm pits, nipples, temple, nose, lips, wrists, hands, orbits, buttocks, and thigh; her ulna was broken, her wrist was broken, her lung was bruised, her jaw was broken or dislocated; she had a subdural hematoma, intra-abdominal wounds, including a torn colon, an atlanto-occipital dislocation (her head was "ripped off her neck," —ligaments were disrupted from the spinal column so that only "tissue and skin" held it to the body), and cerebral contusions or bruising of her brain." *Clark v. State*, 915 N.E. 126, 129.

THE COURT FINDS that "Samantha Muchowicz suffered at least twenty separate injuries, more than one of which would be lethal, and she was still alive when she sustained most of them." *Id*.

THE COURT FINDS that the State's characterization in rebuttal of reckless homicide, by illustrating it in the context of a driving offense, if misleading at all, was not so misleading as to render the jury's verdict unreliable; particularly [in] light of the

Defendant/Petitioner's own testimony, admission of guilt, and the physical evidence of the injuries sustained by the victim.

THE COURT FINDS that the Court correctly instructed the jury on reckless mens rea and reckless homicide in the final instructions.

THE COURT FINDS that the Court's Final Instructions correctly and specifically stated that comments and statements of counsel are not evidence. The Court further finds that the Court's Final Instructions stated that the jury must base its decision on the evidence presented in the case and not based upon sympathy or prejudice.

THE COURT FINDS that during the State's rebuttal closing, the Prosecutor made a single comment that "as attorneys in the future read the case law and they read the case of State of Indiana v. Ian Clark, or Ian Clark versus the State, this case will stand for the proposition that this community and this State will not tolerate what happened here." The Court further finds that this statement was immediately followed by, "It will also stand for the proposition that this, these facts that are sufficient to support the inference that the Defendant knowingly and intentionally murdered Samantha. I am asking you to find the Defendant guilty of murder. Thank you." Tr. 534-35

THE COURT FINDS that there is no probative evidence that the comments were "so persuasive" as to render the jury's verdict unreliable, especially given the Defendant/Petitioner's own admission to killing the child, and the evidence of the brutality of the crime.

THE COURT FINDS that there is no probative evidence that trial counsel or appellate counsel's representation fell below an objective standard of reasonableness and that counsel committed

errors so serious, that the petitioner did not have 'counsel' guaranteed by the 6th Amendment.

THE COURT FINDS that there is no probative evidence that but for any alleged errors by trial counsel or appellate counsel, the result of the proceeding would have been different.

Appellant's App. pp. 121-25.

[7] Clark now appeals the denial of his petition for post-conviction relief. Additional facts will be provided as necessary.

## Standard of Review

[8] Post-conviction proceedings are not "super appeals" through which convicted persons can raise issues they failed to raise at trial or on direct appeal. *McCary v. State*, 761 N.E.2d 389, 391 (Ind. 2002). Post-conviction proceedings instead afford petitioners a limited opportunity to raise issues that were unavailable or unknown at trial and on direct appeal. *Davidson v. State*, 763 N.E.2d 441, 443 (Ind. 2002). The post-conviction petitioner bears the burden of establishing grounds for relief by a preponderance of the evidence. *Henley v. State*, 881 N.E.2d 639, 643 (Ind. 2008). Thus, on appeal from the denial of a petition for post-conviction relief, the petitioner stands in the position of one appealing from a negative judgment. *Id*. To prevail on appeal from the denial of post-conviction relief, the petitioner must show that the evidence as a whole leads unerringly and unmistakably to a conclusion opposite that reached by the post-conviction court. *Id*. at 643-44.

Where, as here, the post-conviction court makes findings of fact and conclusions of law in accordance with Indiana Post-Conviction Rule 1(6), we must determine if the court's findings are sufficient to support its judgment. *Graham v. State*, 941 N.E.2d 1091, 1096 (Ind. Ct. App. 2011), *aff'd on reh'g*, 947 N.E.2d 962. Although we do not defer to the post-conviction court's legal conclusions, we review the post-conviction court's factual findings under a clearly erroneous standard. *Id*. Accordingly, we will not reweigh the evidence or judge the credibility of witnesses, and we will consider only the probative evidence and reasonable inferences flowing therefrom that support the post-conviction court's decision. *Id*.

## Ineffective Assistance of Trial and Appellate Counsel

When we review claims of ineffective assistance of trial and appellate counsel, we apply the same standard. *Harris v. State*, 861 N.E.2d 1182, 1186 (Ind. 2007).

> A defendant claiming a violation of the right to effective assistance of counsel must establish the two components set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). First, the defendant must show that counsel's performance was deficient. This requires a showing that counsel's representation fell below an objective standard of reasonableness, and that the errors were so serious that they resulted in a denial of the right to counsel guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. To establish prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

Counsel is afforded considerable discretion in choosing strategy and tactics, and we will accord those decisions deference. A strong presumption arises that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. The *Strickland* Court recognized that even the finest, most experienced criminal defense attorneys may not agree on the ideal strategy or the most effective way to represent a client. Isolated mistakes, poor strategy, inexperience, and instances of bad judgment do not necessarily render representation ineffective. The two prongs of the *Strickland* test are separate and independent inquiries. Thus, if it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed.

*Timberlake v. State*, 753 N.E.2d 591, 603 (Ind. 2001) (citations and quotations omitted).

Concerning claims of ineffective assistance of appellate counsel, we must be "particularly sensitive to the need for separating the wheat from the chaff in appellate advocacy, and should not find deficient performance when counsel's choice of some issues over others was reasonable in light of the facts of the case and the precedent available to counsel when that choice was made." *Reed v. State*, 856 N.E.2d 1189, 1196 (Ind. 2006). Moreover, ineffective assistance is rarely found in cases where a defendant asserts that appellate counsel failed to raise an issue on direct appeal because the decision of what issues to raise is one of the most important strategic decisions to be made by appellate counsel. *Id.*

Claims of ineffective assistance of appellate counsel generally fall into three categories: (1) denial of access to an appeal; (2) waiver of issues; and (3) failure to present issues well. *Id.* at 1195. To show that counsel was ineffective for

failing to raise an issue on appeal, the defendant must overcome the strongest presumption of adequate assistance, and judicial scrutiny is highly deferential. *Id*. To evaluate the performance prong when counsel failed to raise issues upon appeal, we apply the following test: (1) whether the unraised issues are significant and obvious from the face of the record and (2) whether the unraised issues are "clearly stronger" than the raised issues. *Id*. If the analysis under this test demonstrates deficient performance, then we examine whether the issues which appellate counsel failed to raise would have been clearly more likely to result in reversal or an order for a new trial. *Id*.

## Amendment to the Charging Information During Trial

[13] On the last day of Clark's murder trial, the trial court granted the State's request to amend the charging information. The murder charge originally alleged that Clark "knowing *and* intentionally" killed the child. The trial court allowed an amendment alleging that Clark "knowingly *or* intentionally" killed the child. Trial Tr. p. 358.  Clark's trial counsel objected to the amendment and argued that the substantive change prejudiced Clark's defense. Clark's trial counsel moved for a continuance of the jury trial.

[14] The trial court agreed with the State that the amendment would correct a typographical error and the change would make the charging information conform to the precise language of the murder statute. *Id*. at 360. Further, the trial court stated "the Court would be obligated, I think, to instruct the Jury in any event, as to a correct statement of the law so there's, in the Court's view, no

harm, no foul…." *Id*. In both the preliminary and final instructions, the jury was informed that a person commits murder by knowingly *or* intentionally killing a human being. Arguing that the amendment to the charging information was one of substance rather than one of form, Clark argues that his trial counsel was ineffective for failing to move for a mistrial because the information was amended during trial and his appellate counsel was ineffective for failing to raise the issue on direct appeal.

[15]     Indiana Code section 35-34-1-5(c), provides, "Upon motion of the prosecuting attorney, the court may, at any time before, during, or after the trial, permit an amendment to the indictment or information in respect to any defect, imperfection, or omission in form which does not prejudice the substantial rights of the defendant."

> An amendment [to the charging information] is one of form, not substance, if both (a) a defense under the original information would be equally available after the amendment, and (b) the accused's evidence would apply equally to the information in either form. And an amendment is one of substance only if it is essential to making a valid charge of the crime.

*Fajardo v. State*, 859 N.E.2d 1201, 1207 (Ind.2007).

[16]     Furthermore, "[a] defendant's substantial rights include a right to sufficient notice and an opportunity to be heard regarding the charge; and, if the amendment does not affect any particular defense or change the positions of either of the parties, it does not violate these rights." *Erkins v. State*, 13 N.E.3d 400, 405 (Ind. 2014) (quotation omitted). "Ultimately, the question is whether

the defendant had a reasonable opportunity to prepare for and defend against the charges." *Id.* at 405-06 (quotation omitted).

[17] Throughout his murder trial, Clark maintained his defense that his "reckless" actions caused the two-year-old child's death. Clark's defense permeated voir dire, opening and closing statements, and the jury was given instruction on reckless homicide in addition to murder. The jury was also instructed on the meaning of committing an act "intentionally," "knowingly," and "recklessly." Importantly, the State presented evidence at trial establishing the extent and deliberate and horrendous nature of the child's injuries to counter Clark's claim that his actions were reckless.

[18] Under these circumstances, the change in the charging information was one of form because it did not have an impact on Clark's defense or the evidence he presented. Therefore, Clark's substantial rights were not prejudiced when the charging information was amended during trial to conform with the precise language of the murder statute.

[19] Accordingly, we conclude that Clark has not established 1) that he was prejudiced when trial counsel failed to request a mistrial when the charging

information was amended during trial, or 2) that raising the issue on direct appeal would have resulted in reversal of his murder conviction.[2]

## Failure to Withdraw the Insanity Defense

[20] Clark argues that trial counsel was also ineffective when he withdrew Clark's insanity defense mid-trial. During the preliminary instructions, the court tendered an insanity defense instruction to the jury. During opening statement, the State informed the jury that two psychiatrists would testify that Clark was able to appreciate the wrongfulness of his conduct on the date he killed the child. On the third day of trial, counsel withdrew Clark's insanity defense.

[21] Because trial counsel is deceased, the record does not establish counsel's reason for failing to withdraw the insanity defense, which Clark claims was "destined to fail" because both court-appointed experts concluded that Clark was not insane on the date in question. Appellant's Br. at 20.

[22] Assuming that trial counsel was deficient for failing to withdraw the defense prior to trial, Clark must still establish that there is a reasonable probability that the result of the proceeding would have been different. Clark argues that he was prejudiced "because the State was able to use the defense to question potential

---

[2] At the hearing on Clark's petition for post-conviction relief, appellate counsel testified that he did not raise this issue on direct appeal because he believed that our court would agree with Judge Reed that the amendment was one of form, and not substance. Tr. p. 38.

jurors on irrelevant concepts" and to expose the jury to "information that was not relevant and directly contradicted the chosen defense." *Id*.

[23] Clark's defense at trial was that he recklessly caused the two-year-old child's injuries by falling on her or dropping her on a coffee table. However, the defenseless child suffered at least twenty separate injuries and many of the injuries were lethal. "Neither one fall, nor multiple falls, nor multiple household accidents, could have possibly caused" the child's injuries. *Clark*, 915 N.E.2d at 129. The evidence that Clark knowingly or intentionally injured the child causing her death was overwhelming. Moreover, the State presented evidence at trial that Clark attempted to prevent the child's mother from calling 911 when she returned home to find her child beaten and bloodied.

[24] Although the insanity defense should have been withdrawn prior to trial given the psychiatrists conclusions that Clark was not insane, we cannot conclude that the result of the proceeding would have been different. Faced with the overwhelming evidence that Clark knowingly or intentionally killed the child, Clark cannot establish that the references to the insanity defense during voir dire and preliminary instructions prejudiced his defense. *Cf. Weedman v. State*, 21 N.E.3d 873, 885-86 (Ind. Ct. App. 2014) (holding that the evidence concerning the withdrawn insanity defense was erroneously admitted but did not constitute fundamental error because the evidence was overwhelming that the defendant did not act in self-defense), *trans. denied*.

# Closing Argument

[25] Next, Clark argues that trial counsel was ineffective for failing to object to the prosecutor's argument that Clark started drinking alcohol to make it appear that he was intoxicated when the offense occurred. Clark argues that the argument was speculative and not supported by the evidence. Clark also claims he was prejudiced by the deficient performance because the "only contested issue at trial was *mens rea*." Appellant's Br. at 22.

[26] The evidence at trial established that Clark drank a significant amount of alcohol and became voluntarily intoxicated at some point on the date of the offense. The jury saw photographs of empty beer and liquor bottles on the kitchen counters and coffee table. The jury also heard Clark's testimony that he was often so drunk that he would black out. Clark argued that he was extremely intoxicated when he recklessly injured the child causing her death.

[27] However, Clark's voluntary intoxication is not a defense to the crime. *See* Ind. Code § 35-41-2-5 ("Intoxication is not a defense in a prosecution for an offense and may not be taken into consideration in determining the existence of a mental state that is an element of the offense[.]"). Therefore, even if the State mischaracterized the evidence concerning when Clark consumed most of the alcohol depicted in the photographs of his home, the fact is irrelevant to whether Clark "recklessly," "knowingly," or "intentionally" killed the two-year-old child.

Clark cannot establish that he was prejudiced by his trial counsel's failure to object to the alleged prosecutorial misconduct. As we have repeatedly discussed above, overwhelming evidence supports the jury's conclusion that Clark knowingly or intentionally killed the child.

## Cumulative Errors

Finally, Clark argues that that trial counsel's cumulative errors denied him his constitutional right to a fair trial. Given the overwhelming evidence of his guilt, Clark cannot establish that his defense was prejudiced even when we consider the alleged errors in total. None of the errors had a direct impact on his chosen defense, i.e. that commission of the crime was reckless.

## Conclusion

The post-conviction court properly denied Clark's petition for post-conviction relief.

Affirmed.

Baker, J., and Pyle, J., concur.