# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Aug 07 2019, 9:00 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Rory Gallagher
Marion County Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Sierra A. Murray
Deputy Attorney General
Indianapolis, Indiana

IN THE
# COURT OF APPEALS OF INDIANA

Mingo Thames,
*Appellant-Defendant,*

*v.*

State of Indiana,
*Appellee-Plaintiff.*

August 7, 2019

Court of Appeals Case No.
19A-CR-340

Appeal from the Marion Superior Court

The Hon. Sheila A. Carlisle, Judge

Trial Court Cause No.
49G03-1705-MR-16589

**Bradford, Judge.**

# Case Summary

[1] In April of 2017, Maurice Turentine agreed to purchase drugs from Darrell Miller and James Clark at Clark's Indianapolis home. When Turentine arrived with another man, Darrell's wife Sarah was also in the house. A gunfight broke out, leaving Turentine wounded and Darrell and Clark dead. Eight days later, Sarah, who had known Turentine prior to the gunfight, was searching the internet in an attempt to identify Turentine's then-unknown accomplice and eventually identified him as Mingo Thames. A jury found Thames guilty of two counts of murder, and the trial court sentenced him to an aggregate term of 110 years of incarceration. Thames contends that the State failed to produce enough credible evidence to support his convictions and that the trial court abused its discretion in admitting certain evidence. Because we disagree with both contentions, we affirm.

# Facts and Procedural History

[2] At approximately 2:00 p.m. on April 20, 2017, Sarah met her husband Darrell at the Indianapolis home of Clark. At approximately 2:30 p.m., Sarah and Darrell consumed less than half a gram of methamphetamine, an amount that did not get Sarah high due to the tolerance she had to it. Some four hours later, Clark told Sarah that he was interested in selling some drugs and asked her if she knew anyone who would be interested in buying. Sarah made some inquiries, and Maurice Turentine responded that he would "take a couple grams" of methamphetamine. Tr. Vol. II p. 44.

[3] At approximately 10:15 p.m., Turentine and Thames arrived at the house, and they, Clark, and Darrell went into the kitchen to complete the drug sale while Sarah stayed in the adjacent dining room. Sarah soon walked over so that she could overhear the conversation in the kitchen. When Turentine asked Clark if he could obtain a large quantity of drugs for him, Clark replied that he could if he were given advance notice. Clark also indicated that Turentine would have to go through Clark and Darrell in order the purchase the large amount.

[4] At this point, Turentine gave Thames a "weird" look, as if to say, "it's time now" or "'Okay. Let's go.'" Tr. Vol. II p. 51. Thames reached into the front of his pants, Sarah heard Darrell say Clark's nickname three times, and gunfire commenced. Darrell told Sarah to run, and she did, hiding behind a door in another room. Sarah heard what she estimated to be between five and fifteen shots. After the firing ended, Sarah heard the front door open, heard Turentine say that he had been shot, and saw a gold or tan extended-cab pickup truck drive away. Clark was on the living room floor, soon to expire from shots to the chest and arm. Darrell was in the basement at the bottom of the stairs, with fatal gunshots wounds to his lower extremities and genitalia.

[5] Indianapolis Metropolitan Police Detective Brian Schemenaur interviewed Sarah soon after the shooting, and she described Turentine's accomplice, with whom she had not been previously acquainted, as "a black male, between five foot five and five foot seven, skinny, 40's years of age, light skinned, fade hair, longer on the top, shorter on the sides [and] [m]aybe with a gold tooth." Tr.

Vol. II pp. 203–04. Police responding to the scene indicated that Sarah did not seem intoxicated or on drugs.

[6] On April 28, 2017, Sarah was searching through the Facebook friends of Turentine's nephew when she came upon a photograph of a man on a horse that she recognized from his other profile photographs as Turentine's accomplice, who turned out to be Thames. Sarah contacted Detective Schemenaur with her discovery, and Sarah later selected Thames from a photo array. Police discovered an address at which they believed Thames was residing with his wife and investigated. At the address, police discovered a 2002 Dodge Ram pickup truck that was registered to Turentine in the garage. Turentine's blood was found on the truck's tailgate, and Thames's fingerprints were found on the hood.

[7] On May 5, 2017, the State charged Thames with two counts of murder and Leve 5 felony carrying a handgun without a license. On August 7, 2018, the State added an allegation that Thames was a habitual offender. On September 27, 2017, Thames was with a group called Imperial Valley Ministries in El Paso, Texas, when he was apprehended in possession of false identification. At the time, Thames was "five foot seven, 150 pounds[,] light skinned[, had a] faded haircut, and was 48 years of age." Tr. Vol. II p. 204.

[8] Thames's jury trial began on December 10, 2018. Sarah testified that when she first saw Thames's photograph on Facebook, she did not believe him to be Turentine's accomplice, but that she heard Clark's voice in her head, telling her to look at more of the man's photographs. Sarah, however, acknowledged that

Clark could not have actually been speaking to her. On redirect, Sarah also indicated that she had had a feeling upon seeing the photograph of Thames on a horse that caused her to look further, a feeling that "may have included a feeling that [she was] hearing [Clark.]" Tr. Vol. II p. 105. Detective Schemenaur testified, *inter alia*, that he had done internet research on Imperial Valley Ministries and had determined that it was a homeless-outreach ministry. The jury found Thames guilty of two counts of murder; the State dropped the habitual-offender allegation; and, on January 14, 2019, the trial court sentenced Thames to 110 years of incarceration.

# Discussion and Decision
## I. Sufficiency of the Evidence

[9] When reviewing the sufficiency of the evidence, we neither reweigh the evidence nor resolve questions of credibility. *Jordan v. State*, 656 N.E.2d 816, 817 (Ind. 1995). We look only to the evidence of probative value and the reasonable inferences to be drawn therefrom which support the verdict. *Id*. If there is evidence of probative value from which a reasonable trier of fact could conclude that the defendant was guilty beyond a reasonable doubt, we will affirm the conviction. *Spangler v. State*, 607 N.E.2d 720, 724 (Ind. 1993).

[10] Thames contends only that his conviction must be reversed by operation of the incredible dubiosity rule, *i.e.*, that the State's evidence of his identity simply cannot be believed by a reasonable person. Specifically, Thames contends that Sarah's identification of him as Turentine's accomplice was the result of an

auditory hallucination caused by chronic drug use and simply cannot be believed.

> Within the narrow limits of the "incredible dubiosity" rule, a court may impinge upon a jury's function to judge the credibility of a witness. If a sole witness presents inherently improbable testimony and there is a complete lack of circumstantial evidence, a defendant's conviction may be reversed. This is appropriate only where the court has confronted inherently improbable testimony or coerced, equivocal, wholly uncorroborated testimony of incredible dubiosity. Application of this rule is rare and the standard to be applied is whether the testimony is so incredibly dubious or inherently improbable that no reasonable person could believe it.

*Love v. State*, 761 N.E.2d 806, 810 (Ind. 2002) (citations omitted).

[11]  The incredible dubiosity rule does not apply in this case, as the record contains ample evidence to corroborate Sarah's identification of Thames as Turentine's accomplice. First, Sarah's description of Thames's appearance closely matches his actual appearance when he was arrested. As mentioned, soon after the shootings, Sarah described Turentine's accomplice as "a black male, between five foot five and five foot seven, skinny, 40's years of age, light skinned, fade hair, longer on the top, shorter on the sides [and] [m]aybe with a gold tooth." Tr. Vol. II pp. 203–04. When apprehended a few months later, Thames was "five foot seven, 150 pounds[,] light skinned[, had a] faded haircut, and was 48 years of age." Tr. Vol. II p. 204. Second, there is substantial evidence tying Thames and Turentine to what one may reasonably infer was the getaway vehicle. The truck found in Thames's garage was consistent with Sarah's description of the getaway vehicle, was registered to Turentine, and yielded

Turentine's blood and Thames's fingerprints when examined. In short, the truck ties Thames and Turentine to each other and ties both to the shootout. Finally, the fact that Thames was found in Texas with false identification is further circumstantial evidence of his guilt. It is well-settled that "[f]light and related conduct may be considered by a jury in determining a defendant's guilt." *Dill v. State*, 741 N.E.2d 1230, 1232 (Ind. 2001).

[12] In any event, the record does not establish that Sarah's testimony is inherently incredible. Thames claims that Sarah's testimony about hearing Clark's voice clearly indicates that she was experiencing a drug-induced auditory hallucination at the time. This claim, however, is nothing more than speculation, supported by no evidence in the record. Moreover, Sarah acknowledged that Clark could not have actually been speaking to her and that the feeling that caused her to investigate Thames's Facebook page further "may have included a feeling that [she was] hearing [Clark.]" Tr. Vol. II p. 105. A reasonable interpretation of Sarah's testimony—one which the jury was free to make—is that she did not actually believe she was hearing Clark's voice. Because Sarah's identification of Thames as Turentine's accomplice was corroborated by ample evidence in the record and was not inherently incredible, the incredible dubiosity doctrine does not help Thames.

## II. Whether the Trial Court Abused its Discretion in Admitting Certain Evidence

[13] Thames contends that the trial court abused its discretion in admitting Detective Schemenaur's testimony that his internet research had revealed that

Imperial Valley Ministries was a homeless-outreach ministry was inadmissible hearsay. A trial court's ruling on the admission or exclusion of evidence is reviewed for an abuse of discretion that results in prejudicial error. *Williams v. State*, 43 N.E.3d 578 (Ind. 2015). A trial court's evidentiary decision will be reversed for an abuse of discretion only where the court's decision is clearly against the logic and effect of the facts and circumstances, or when the court misinterprets the law. *Id*.

[14] Thames did not object to the evidence in question on the ground of hearsay and so has waived it for appellate review. As such, he would have to establish that the trial court committed fundamental error in admitting the evidence to obtain relief. "The fundamental error exception is 'extremely narrow, and applies only when the error constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process.'" *Delarosa v. State*, 938 N.E.2d 690, 694 (Ind. 2010) (quoting *Matthews v. State*, 849 N.E.2d 578, 587 (Ind. 2006)). To be fundamental, the error "must either 'make a fair trial impossible' or constitute 'clearly blatant violations of basic and elementary principles of due process.'" *Id*. (quoting *Clark v. State*, 915 N.E.2d 126, 131 (Ind. 2009)). The exception applies "only in 'egregious circumstances.'" *Id*. at 694–95 (quoting *Brown v. State*, 799 N.E.2d 1064, 1068 (Ind. 2003)).

[15] Even if we assume, *arguendo*, that the trial court abused its discretion in some way by admitting evidence that Imperial Valley Ministries is a homeless-outreach ministry, any such error could only be considered harmless. When a

trial court erroneously excludes or admits evidence, if its "probable impact on the [factfinder], in light of all the evidence in the case, is sufficiently minor so as not to affect the substantial rights of the parties," the error is harmless. *Daniels v. State*, 683 N.E.2d 557, 559 (Ind. 1997) (citing *Schwestak v. State*, 674 N.E.2d 962 (Ind. 1996)). Thames does not claim, much less establish, that the testimony in question prejudiced him, much less rise to level of making a fair trial possible. Indeed, even if Thames *had* argued that he was prejudiced, we fail to see how the jury knowing that Imperial Valley Ministries worked with the homeless could have harmed him in any way. Thames has failed to establish harmful error, much less fundamental error.

[16] We affirm the judgment of the trial court.

Vaidik, C.J., and Riley, J., concur.