

FILED

Dec 13 2018, 9:53 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Clifford M. Davenport
Davenport Law Offices
Anderson, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Jesse R. Drum
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Matthew Edward Greer,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

December 13, 2018

Court of Appeals Case No.
18A-CR-404

Appeal from the Madison Circuit
Court

The Hon. Thomas Newman,
Judge

Trial Court Cause No.
48C03-1706-F1-1581

**Bradford, Judge.**

# Case Summary

[1] In 2016, Matthew Greer convinced his wife Christina to teach their minor son D.G. about sex. To that end, Christina fellated D.G. in the bathroom as Greer watched and masturbated. Several months later, Greer notified the Indiana Department of Child Services ("DCS") that Christina had molested D.G. After DCS interviewed D.G. and police interviewed Christina, the State arrested Greer and charged him with several crimes.

[2] Two weeks before Greer's trial, D.G. testified at a deposition that Greer had not participated in his molestation, merely walking in, witnessing what Christina was doing, and leaving. The prosecutor told D.G. that he thought he was lying and reminded him that he could get in "trouble" if he did not tell the truth at trial. D.G. then testified in a way consistent with his statements during his DCS interview and ultimately testified against Greer at trial, as did Christina. A jury found Greer guilty as charged, and the trial court sentenced him to forty-three and one-half years of incarceration. Greer alleges that the prosecutor's remarks during D.G.'s deposition amounted to prosecutorial misconduct that rises to the level of fundamental error. Because the prosecutor's conduct was reasonable and non-threatening, we disagree and affirm.

# Facts and Procedural History

[3]     In the fall of 2016, Greer, after asking many times, finally convinced his wife Christina to teach their son D.G. about sex so that his "first time wouldn't be awkward." Tr. Vol. I p. 68–69. In October of 2016, approximately one week after D.G.'s thirteenth birthday and after doing methamphetamine with Greer, Christina woke D.G. up early in the morning and performed oral sex on him in the bathroom while Greer stood nearby, watched, masturbated, looked at pornography on his mobile telephone, and showed the pornography to D.G. Greer told D.G. that "this [was] the best b*** j** [he was] ever going to get." Tr. Vol. I p. 80. After fellating D.G., Christina fellated Greer in the bathroom in front of D.G.

[4]     By June of 2017, Greer and Christina had separated and frequently argued. Around this time, Greer contacted DCS and reported that Christina had molested D.G. On June 16, 2017, D.G. was interviewed by DCS. Based on the results of D.G.'s interview, Christina was arrested later that day and confessed six days later when interviewed by police. Despite not having spoken with D.G. about his interview, Christina told a police detective before her interview that her statement would "mirror" D.G.'s. Tr. Vol. I p. 176. Later, when police tried to arrest Greer, he forcibly resisted. On June 23, 2017, the State charged Greer with Level 1 felony child molesting, Level 3 felony vicarious sexual conduct, Level 4 felony incest, Level 6 felony performing sexual conduct in the presence of a minor, and Class A misdemeanor resisting law enforcement.

Approximately two weeks before trial, D.G. was deposed. At first, D.G. testified that Greer had "walked in to the bathroom[,] was shocked at what he observed[,] and went back to bed." Tr. Vol. I p. 107. The prosecutor told D.G. that he did not think that he was telling the truth and that he could get into trouble for lying under oath. D.G. then admitted that he had lied and asked "to restart[.]" Tr. Vol. I p. 107. D.G.'s subsequent deposition testimony incriminated Greer, as did his trial testimony. On January 19, 2018, the jury found Greer guilty as charged, and the trial court sentenced him to forty-three and one-half years of incarceration.

# Discussion and Decision

Greer claims that the prosecutor's alleged misconduct during D.G.'s deposition denied him his right to present witnesses in his own defense at trial.

> A fundamental element of due process of law is the right of an accused to present witnesses in his own defense. *United States v. Hooks*, 848 F.2d 785, 799 (7th Cir. 1988). Those witnesses must be "free to testify without fear of governmental retaliation." *Id.* (quoting *United States v. Blackwell*, 694 F.2d 1325, 1334 (D.C. Cir. 1982)). […] A prosecutor's warning of criminal charges during a personal interview with a witness improperly denies the defendant the use of that witness's testimony regardless of the prosecutor's good intentions. [*Diggs v. State*, 531 N.E.2d 461, 464 (Ind. 1988)]. A prosecutor may not prevent nor discourage a defense witness from testifying. *Id.*

*Collins v. State*, 822 N.E.2d 214, 220 (Ind. Ct. App. 2005), *trans. denied*.

[7] Greer acknowledges that he failed to raise this issue in the trial court but attempts to avoid the effect of his waiver by claiming that the error was fundamental. "The fundamental error exception is 'extremely narrow, and applies only when the error constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process.'" *Delarosa v. State*, 938 N.E.2d 690, 694 (Ind. 2010) (quoting *Matthews v. State*, 849 N.E.2d 578, 587 (Ind. 2006)). To be fundamental, the error "must either 'make a fair trial impossible' or constitute 'clearly blatant violations of basic and elementary principles of due process.'" *Id*. (quoting *Clark v. State*, 915 N.E.2d 126, 131 (Ind. 2009)). The exception applies "only in 'egregious circumstances.'" *Id*. at 694–95 (quoting *Brown v. State*, 799 N.E.2d 1064, 1068 (Ind. 2003)). A finding of fundamental error is essentially a conclusion that the trial court erred by failing to *sua sponte* correct an error. *Brewington v. State*, 7 N.E.3d 946, 974 (Ind. 2014).

[8] We conclude that Greer has failed to establish that anything the prosecutor did was improper, much less egregious or blatant. Although the record does not contain a transcript of D.G.'s pretrial deposition, portions of it were made part of the record during Greer's cross-examination of D.G.:

> Q     Okay but then [the prosecutor] was talking to you and he says do you remember these series of questions and answers "[D.G.] I'm going to be quite honest with you I've been doing this this is my twenty-second year and I can just tell from your demeanor that you're not being truthful here today"?
>
> A     Yes I [re]member that.

Q       Did that frighten you?

A       Yes.

Tr. Vol. I p. 93.

[9]     In the deposition, the prosecutor suggested to D.G. that he had concocted a story with his grandfather to protect Greer, which led to the following:

> Q       Okay let[']s get back to [the prosecutor] and the deposition.  Umm… he says umm… I know because I think it's your grandpa and you answered it's not my grandpa umm… you want to know how I know that [the prosecutor] says and you says he hasn't told me anything I swear he hasn't told me anything and then [the prosecutor] reminds you that he saw the two (2) of you talking or no he says because you were outside of the room last week before we talked your grandpa told me [D.G.] is going to say something different [than] what he said in his video.  Did your grandpa tell you to say something different?
>
> A       He did not.
>
> Q       But when [the prosecutor] suggested that to you you said umm… umm… yet I have no clue.  You said I have no clue I swear and then [the prosecutor] says well that was like four (4), five ([5]) six (6) days ago you were making sense then in this case and now you're saying something different.  Did that scare you?
>
> A       Yes.
>
> [….]
>
> Q       Okay and umm… back to the deposition do you remember when [the prosecutor] said to you and she[,] referring to your Mother[,] is doing thirty (30) years and lying about it.  That doesn't make any sense [D.G.] look I understand this is your parents and you're not happy about the situation but there is no use in you getting jammed up for something that your mom is still going to come and testify and tell the truth so what's going to

happen is your dad can still get convicted and you're in trouble for lying do you remember him saying that?

A       Yes.

Q       Did that scare you?

A       Yes.

Q       What does jammed up mean to you?

A       Put [into] a situation.

Q       What kind of a situation?

A       Umm… a bad spot where I don't want to be liking getting in trouble.

Q       Okay and what in your mind at fourteen (14) thirteen (13) years old what does getting in trouble mean in this context?  Did you think you could go jail?

A       I thought that's what he was talking about yes.

Q       And then he says this is not a joke anymore and you say I know.  And then later on do you recall this series of question and answer[s]?  [D.G.] you got to tell the truth right now.  This is how you can get yourself out of trouble.  Did you believe when he said that, that you were in trouble?

A       I thought I was going to be yes.

Q       Okay.  By admitting you're trying to save your dad here and you say okay aren't you and you say yes okay not that's not going to work now he says to you.  What did you take that to mean?

A       I thought he was saying you know it's not going to it doesn't matter if you're trying to protect him or not.

Q       Yeah in other words if you don't say the same thing today that you said before [during your DCS interview] you're in trouble.  Is that what went through your mind?

A       Yeah.

Q      You have to tell the truth.  You do[] not want to get up in front of a Judge and say what you're saying here because that's not going to end well for you or your dad.  Do you remember that statement?

A      Yes.

Q      And you said yes sir.  Did that scare you?

A      Kind of yes.

Q      Did that bring to mind that you were going to get punished if you didn't come in to court and say what you had originally said?

A      A little bit yeah.

Tr. Vol. I pp. 94–95, 96–98.

[10]    Under the circumstances of this case, we conclude that none of this, despite the warnings of "trouble" if D.G. failed to testify truthfully, amounts to misconduct.  First and foremost, the only reason that any of this even occurred is that D.G. radically changed his story two weeks before a trial in which he was expected to be one of the State's leading witnesses.  We think that the prosecutor was entitled to fully explore this change, including informing the witness that there could be consequences for lying on the stand.  Moreover, the prosecutor did not explicitly threaten D.G. with prosecution and repeatedly reminded him that he would be in trouble only if he did not tell the truth, *not* if he testified on Greer's behalf.  Finally, it is not as though the prosecutor lacked an objective, good-faith basis for believing that D.G. was lying.  The prosecutor was fully aware that, not only had D.G. incriminated his father in earlier statements, he had done so in a way that was almost entirely consistent with—

and therefore corroborated by—Christine's extremely self-incriminating statements.

[11]    Greer draws our attention to the case of *Diggs v. State*, 531 N.E.2d 461 (Ind. 1988), in which the Indiana Supreme Court concluded that conduct by a prosecutor improperly denied the defendant the right to present witnesses on his behalf.  In *Diggs*, the prosecutor approached a potential defense witness during trial and told him "that if he testified to 'the same statements he did in his deposition, he [would] be charged, according to his own testimony.'"  *Id*. at 464 (brackets in original).  The witness refused to testify when called, invoking his Fifth Amendment right against self-incrimination, and the Court concluded that this amounted to an erroneous denial of Diggs's right to present witnesses.  *Id*. This case is readily distinguishable from *Diggs* on the facts.  Perhaps the most compelling difference between the cases is that the prosecutor in *Diggs* explicitly threatened the witness with prosecution for perjury if he testified a certain way, which did not occur here.  Moreover, in *Diggs* there is no indication that the witness in question abruptly changed his story on the eve of trial or that the prosecutor had any good-faith reason to question the witness's veracity.  Simply put, the prosecutor's conduct here is not in the same league as the prosecutor's conduct in *Diggs*.  We conclude that Greer's reliance on *Diggs* is unavailing.

[12]    The prosecutor's conduct in this case strikes us much more as a reasonable inquiry into why a prosecution witness had suddenly changed his story two weeks before trial than an attempt to browbeat him into not testifying for the defendant.  Were we to hold otherwise, we would essentially be ruling that it is

"egregious" misconduct for a prosecutor to vigorously question a witness about why he had told one story for months only to change his tune two weeks before trial. We will not issue such a ruling. We conclude that Greer has failed to establish error under the circumstances of this case, much less fundamental error.

[13] The judgment of the trial court is affirmed.

Bailey, J., and Altice, J., concur.