## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jun 28 2019, 10:55 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Rory Gallagher
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Samuel J. Dayton
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Timothy J. Etter,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff* | June 28, 2019<br><br>Court of Appeals Case No.<br>18A-CR-2181<br><br>Appeal from the Marion Superior Court<br><br>The Honorable Mark D. Stoner, Judge<br><br>Trial Court Cause No.<br>49G06-1708-F3-30689 |

**Altice, Judge.**

### Case Summary

[1] Following a jury trial, Timothy Etter was convicted of Level 3 felony criminal confinement, Class B misdemeanor battery, and Level 4 felony burglary. Etter challenges only his burglary conviction on appeal, raising the following issues:

1) Did the trial court commit fundamental error by admitting a statement made by an unidentified individual who offered information to the police at the scene?

2) Did the State present sufficient evidence to support the burglary conviction?

[2] We affirm.

## Facts & Procedural History

[3] Around 8:00 on the evening of August 13, 2017, Etter knocked at Catie Rogers's front door, where she lived with her two-year-old daughter M.M. Rogers answered the door holding her daughter, greeted Etter with a kiss, and let him inside. She had been expecting Etter, with whom she shared an intimate relationship. Etter did not have a key to the home, but he knew the passcode for the security system and often stayed with Rogers and M.M.

[4] Etter arrived with an open case of beer, and Rogers "could tell that he had been drinking." *Transcript Vol. II* at 66. After entering the living room, Etter became "very hostile" and belligerent. *Id.* at 67. Over the course of the next hour or so and in the presence of M.M., Etter struck Rogers in the face at least five times, choked her, and confined her inside the house. He overturned a table, damaged the television, and dumped the contents of Rogers's purse during his rage. He

took Rogers's keys to keep her from leaving and demanded the passcode for her cellphone, which she provided. Rogers thought she "was going to die," as Etter continued to threaten and belittle her. *Id.* at 73.

[5] At some point, Etter turned his attention to Rogers's cellphone, which he used to send belligerent text messages to several of her contacts, including coworkers, starting around 9:00 p.m. He sent the following message to both Joshua Mullinix (M.M.'s father) and Joshua Dost (a man Rogers had been dating) around 9:30 p.m.: "F**k you b**ch. This is Tim." *Id.* at 113.

[6] Mullinix immediately called Rogers's phone, and Etter answered. When Mullinix asked Etter why he had the phone, Etter responded, "I hit her a couple of times, what are you going to do about it." *Id.* at 209. Mullinix told Etter that he was on his way. Because he was about thirty-five minutes away, Mullinix called Rogers's family members while driving and finally reached her sister, Amanda Rush. Rush also called Rogers's phone, and Etter answered. Etter was angry and "hyped up." *Id.* at 220. He told Rush, "yeah, I smacked that bitch." *Id.* Rush then called the police and other family members who lived closer to Rogers.

[7] Rogers's mother, Angela, and brother, Jerry, were the first to arrive at her house. They knocked on the door but there was no answer, and the lights were out. By this time, Etter had forced Rogers and M.M. upstairs and had obtained a gun from the top of Rogers's dresser. After seeing movement from upstairs, Angela and Jerry began to try to break the glass on the front door to gain

access. They heard several gunshots from inside. Angela was able to reach her hand through the glass, but Etter struck her hand.

[8] Shortly thereafter, Etter pushed the glass panel out of the door. He came through the now-open panel and knocked Angela to the ground. Jerry swung at Etter and then ran, taunting Etter to draw him away. Etter chased Jerry into the street, while Angela went into the house to find Rogers and M.M. and bring them to safety outside. Thereafter, Etter stopped arguing with Jerry, picked up the gun off the ground, and walked back into the house through the opening in the front door. Jerry then went to Etter's vehicle, a gold Dodge, which was parked behind the house, and slashed two of the tires.

[9] Minutes later, multiple police officers began responding to the scene, including IMPD Officer Kristen Hartman who arrived at 10:06 p.m. Etter had escaped out the back door and left in his vehicle. Of significant note inside the house, Officer Hartman observed blood in the kitchen, bullet holes in the wall, items strewn about the living room, a table flipped over, and damage to the television. An evidence technician came and took pictures of the scene.

[10] Officer Hartman escorted Rogers into the house so that she could gather some personal items, as Rogers and M.M. needed to stay somewhere else because Etter had yet to be located. Family members nailed a piece of carpet over the broken door panel, and Rogers changed the passcode for her alarm system and locked the front door before she left.

[11] Thereafter, Officer Hartman drove to a nearby location to start typing her report of the incident. She stayed on the call because the situation was so chaotic. While typing the report, Officer Hartman heard a residential alarm dispatch at 11:54 p.m. for Rogers's house. She arrived, along with two other officers, within five minutes and found the front door of the house "left wide open" and the alarm blaring. *Id.* at 187. The officers immediately cleared the house, which took less than a minute. As soon as IMPD Officer Derek Etheridge came back outside, he was approached by an unidentified person who informed him that "a white male came out of the outside of the house, got into a gold Dodge, with two flat tires, and drove southbound from the residence." *Id.* at 236. Officer Etheridge then drove southbound for about two minutes and found Etter's vehicle parked at a gas station just after midnight. Etter was inside the vehicle.

[12] After Etter was arrested, Officer Hartman began inventorying the vehicle. Rogers's cellphone was found on the passenger seat, but her gun was never located. In the trunk, Officer Hartman found "some electronics", which were later determined to be a DVR from Rogers's home that stored security footage from four cameras on the outside of her property. *Id.* at 190.

[13] Rogers returned to her house the next day. As soon as she walked inside, she noticed that the drawers under her bay window had been "pulled out and left out, like it was obvious that somebody had been there." *Id.* at 103. Her DVR was missing from inside one of the drawers. Rogers later identified the DVR found in Etter's trunk as hers.

[14] On August 21, 2017, the State charged Etter with eleven counts of criminal conduct. After several amendments, Etter ultimately faced ten counts: Count I, Level 3 felony criminal confinement (of Rogers); Count II, Level 4 felony unlawful possession of a firearm by a serious violent felon; Count III, Level 5 felony criminal confinement (of Rogers); Count IV, Level 5 felony criminal confinement (of M.M.); Count V, Level 5 felony criminal recklessness (shooting a firearm in an inhabited dwelling); Count VI, Level 6 felony pointing a firearm (at Jerry); Count VII, Level 6 felony strangulation; Count VIII, Class A misdemeanor battery (of Angela resulting in bodily injury); Count IX, Level 5 felony battery (of Angela with a deadly weapon); and Count X, Level 4 felony burglary. The State also alleged that Etter was a habitual offender.

[15] On June 19, 2018, a jury found Etter not guilty of Count VI, guilty of a lesser included offense – Class B misdemeanor battery – under Count IX,[1] and guilty as charged on all other counts. Etter then waived his right to a jury trial on the habitual offender enhancement and admitted to being a habitual offender. After merging several counts, the trial court entered convictions on Counts I, VIII (as a Class B misdemeanor rather than a Class A misdemeanor), and X. The court imposed a partially-suspended, aggregate sentence of 22 years and

---

[1] The trial court improperly indicated in its sentencing order that the jury found Etter guilty of a lesser included offense on Count VIII. Rather, the jury found Etter guilty as charged – as a Class A misdemeanor – on this count. It was the charge of battery by means of a deadly weapon, Count IX, that the jury found Etter guilty of a lesser offense – a Class B misdemeanor rather than a Level 5 felony.

180 days in the Department of Correction. Etter now appeals his conviction for burglary.

## Discussion & Decision

### 1. Fundamental Error

Etter contends that Officer Etheridge should not have been permitted to testify regarding what the unidentified person told him at the scene of the house alarm. Officer Etheridge testified that this person told him, "a white male came out of the outside of the house, got into a gold Dodge, with two flat tires, and drove southbound from the residence." *Transcript Vol. II* at 236. Etter argues that admission of this hearsay statement violated his Sixth Amendment right to confront and cross-examine witnesses against him.[2] Acknowledging that he did not preserve the issue below, Etter claims that admission of this statement amounted to fundamental error.

The fundamental error exception to the contemporaneous objection rule is "extremely narrow" and applies only in egregious circumstances "when the error constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process." *Greer v. State*, 115 N.E.3d 1287, 1289 (Ind. Ct. App. 2018)

---

[2] The Confrontation Clause of the Sixth Amendment to the United States Constitution, applicable to the States by the Fourteenth Amendment, provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right … to be confronted with the witnesses against him…."

(quoting *Delarosa v. State*, 938 N.E.2d 690, 694 (Ind. 2010)).  For error to be fundamental, the harm or potential for harm therefrom must be substantial and apparent.  *Torres v. State*, 12 N.E.3d 272, 274 (Ind. Ct. App. 2014), *trans. denied*.  "This means that irremediable prejudice to a defendant's fundamental right to a fair trial must be immediately apparent in the disputed evidence".  *Id*.

[18]  Etter has failed to establish error, let alone fundamental error.  "[T]he Sixth Amendment prohibits the introduction of testimonial statements by a non-testifying witness, unless the witness is 'unavailable to testify, and the defendant had had a prior opportunity for cross-examination.'"  *Ward v. State*, 50 N.E.3d 752, 757 (Ind. 2016) (quoting *Crawford v. Washington*, 541 U.S. 36, 54 (2004)).  The Sixth Amendment does not prohibit the admission of nontestimonial hearsay statements.  *See id.*

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.  They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Id*. (quoting *Davis v. Washington*, 547 U.S. 813, 822 (2006)).

[19]  In this case, the unidentified individual approached Officer Etheridge within two minutes of officers arriving in response to the residential alarm.  The alarm was still blaring.  It was just before midnight and the address had been the scene

of a violent criminal attack only two hours prior. The suspect, Etter, had escaped the earlier scene and had yet to be found. He was possibly still armed with the handgun he had fired during the attack. The unidentified individual provided Officer Etheridge with a description of the suspect, the suspect's vehicle, and the suspect's direction of travel. Officer Etheridge then drove in that direction and found Etter in his vehicle about two minutes away. The primary purpose of the individual's statement was clearly to enable Officer Etheridge to meet an ongoing emergency. Accordingly, admission of this nontestimonial statement did not violate the Sixth Amendment or constitute fundamental error.

## 2. Sufficiency of the Evidence

[20] Etter challenges the sufficiency of the evidence supporting his burglary conviction. Our standard of review on a claim on insufficient evidence is well settled:

> For a sufficiency of the evidence claim, we look only at the probative evidence and reasonable inferences supporting the verdict. *Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007). We do not assess the credibility of witnesses or reweigh the evidence. *Id*. We will affirm the conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. *Id*.

*Love v. State*, 73 N.E.3d 693, 696 (Ind. 2017). To convict Etter of burglary as charged the State was required to prove that he broke and entered Rogers's home with the intent to commit theft therein. *See* Ind. Code § 35-43-2-1(1).

[21]     On appeal, Etter acknowledges that the evidence establishes that he stole the DVR from inside Rogers's home and that he was the one that set off Rogers's alarm by opening the front door after the earlier attack. His sole contention is that the State failed to establish when he took the DVR. Was it after he went back into the house through the open door (*i.e.* requiring no breaking) during the first incident and left out the back door? Or was it when he returned just before midnight, opened the door, and set off the alarm? Etter claims there is no evidence to support one conclusion over the other. We cannot agree.

[22]     During her testimony, Officer Hartman noted her significant observations upon entering the home after the attack, including an overturned table, damaged television, bullet holes in the wall, and personal items strewn about. The evidence technician took photographs of all this. Importantly, however, there were no pictures of and Officer Hartman did not testify about drawers pulled out from under the bay window in that same area. This indicates that the drawers were most likely not out of place immediately following the first incident.

[23]     Moreover, Rogers went into the house with Officer Hartman after the attack to gather her things before leaving for the night, yet she did not observe the drawers pulled out until the next day. Rogers testified that she was aware that the alarm had been set off and that upon her later return, "it was obvious that somebody had been there." *Transcript Vol. II* at 103. Rogers testified that she noticed the pulled-out drawers "[a]s soon as we walked in there". *Id*. This was

where she kept the DVR, which was found in Etter's trunk shortly after the house alarm went off.

[24] Based on the totality of the evidence, the jury could reasonably infer that Etter returned around midnight and stole the DVR after breaking and entering through the front door. Accordingly, his sufficiency challenge fails.

[25] Judgment affirmed.

Kirsch, J. and Vaidik, C.J., concur.