## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D),
this Memorandum Decision shall not be
regarded as precedent or cited before any
court except for the purpose of establishing
the defense of res judicata, collateral
estoppel, or the law of the case.



FILED

May 28 2020, 6:09 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

James A. Hanson
Fort Wayne, Indiana

ATTORNEY FOR APPELLEE

Caryn N. Szyper
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Mickey Davis,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

May 28, 2020

Court of Appeals Case No.
19A-CR-2818

Appeal from the Allen Superior
Court

The Honorable David M. Zent,
Judge

Trial Court Cause No.
02D06-1905-F3-30

**Bradford, Chief Judge.**

# Case Summary

[1] In October of 2019, Mickey Davis was convicted of Level 3 felony criminal confinement, Level 5 felony battery, and Level 5 felony domestic battery and ultimately sentenced to sixteen years of incarceration. On appeal, Davis contends that (1) the trial court failed to find that the State had engaged in prosecutorial misconduct or to provide the jury with an admonishment regarding the alleged misconduct, and (2) his criminal-confinement and battery convictions violate Indiana constitutional prohibitions against double jeopardy. Because we disagree, we affirm.

# Facts and Procedural History

[2] On April 26, 2019, Davis arrived at the residence of Jaleesa Jackson, his girlfriend at the time. Shortly thereafter, the two began arguing. Jackson was standing in her bathroom and attempted to leave, but Davis would not allow it. Once Davis allowed Jackson to exit the bathroom, the argument continued. After Davis refused to leave the residence, Jackson attempted to leave but was stopped by Davis, who locked the security door and blocked it with his body. Davis pushed Jackson in the face to force her away from the door. Noticing that Davis was becoming more agitated, Jackson armed herself with a steak knife, but Davis grabbed it from her and threw it to the ground. Jackson grabbed her phone and attempted to call 911, but Davis knocked it out of her hand. At that point, Davis began punching Jackson. Jackson fell to the floor and curled into a ball, attempting to protect herself. Davis kicked Jackson

several times and continued punching her once he positioned himself on top of her. After Davis was on top of Jackson, he placed his hands around her throat and choked her until she lost consciousness. As Jackson regained consciousness, Davis began slamming her head against the floor.

[3]    Around that same time, Jackson's next-door neighbor Jada Clark heard noise and a scream for help coming from Jackson's residence. Clark went to Jackson's residence and observed Davis hitting Jackson while on top of her. As she pounded on the door, Clark told Davis to stop and said that she was calling the police. Realizing she had forgotten her phone, Clark ran back to her residence, retrieved her phone, and called 911. Once Clark returned to Jackson's residence, Davis shoved past her and fled the scene in his vehicle. When Detective Brent Roddy arrived on the scene, he observed

> a large amount of blood on the sidewalk and the steps leading up to the apartment, on the handrail, on the security door, just inside of the door. When you proceed into the apartment it opens up into a living room and all of the furniture was moved around as if there had been an altercation. There was blood literally everywhere. I was astonished that I didn't find a body, that the victim was still alive.

Tr. Vol. III p. 167. After law enforcement arrived, Jackson was transported to the hospital, where she recounted the details of the altercation to law enforcement and medical personnel. Jackson had a fully swollen left eye, a partially swollen right eye, and a laceration on her nose; both of her lips were split open; and she had a tremendous amount of blood covering her body.

On May 3, 2019, the State charged Davis with Level 3 felony criminal confinement, Level 5 felony battery, Level 5 felony domestic battery, Level 6 felony strangulation, and Class A misdemeanor interference with the reporting of a crime. On October 7, 2019, the trial court held a status hearing, at which it appointed Jackson a public defender, given the possibility that she may testify in contradiction to the statements she had previously made to police. That hearing, in relevant parts, proceeded as follows:

> [STATE]: This is one where we put it out for status because the victim in this case is on probation for battery with a deadly weapon. This is one we want her to have an attorney to be advised of her consequences because it is my understanding, and has been my understanding since [Defense Counsel] was in the case that victim is going to recant and her recantation will be inconsistent with what she told the police. Both of them cannot be true. So I believe [the Chief Public Defender] spoke with her and advised her, gave her some sound legal advice. I just wanted to make sure that that was the case.
>
> [CHIEF PUBLIC DEFENDER]: I did give her some legal advice, but I didn't go into any specifics with her because this morning is not the time to do that. I've let her know that the prosecutor is threatening her with having her probation violation [sic] if what she says is different than what she said. My advice to her is to tell the truth. Obviously, that's what I told her to do.
>
> THE COURT: Sure. Of course.
>
> [CHIEF PUBLIC DEFENDER]: And if the truth is not what it was previously said she may go to jail for that. She does want to have a public defender?
>
> THE COURT: She does?

[CHIEF PUBLIC DEFENDER]: She does want a public
defender –

THE COURT: Okay.

[CHIEF PUBLIC DEFENDER]: - before she makes a decision
about what to say – um – but I have given her that bit of advice,
but I don't know the specifics enough to do anything else today,
but I have told her that there will be a consequence for her
testifying next week, but I'm telling her to testify truthfully.

THE COURT: If she doesn't tell the truth.

[CHIEF PUBLIC DEFENDER]: Well, no. If she does tell the
truth, if it's not what she believes is the truth. If the prior
statement – if what she tells as truth next week is different than
what she previously said there's a consequence for perhaps a false
reporting, so I've explained that to her.

Tr. Vol. II pp. 10–11.

[5]     On October 15 and 16, 2019, a jury trial was held. On the first day of trial, the
State reported to the court that Jackson had been arrested over the weekend for
operating a vehicle while intoxicated and was being held in the county jail.
Jackson was ultimately transported to the courthouse and testified at trial.
Jackson testified that due to intoxication, she could not recall the events that
took place the night she was attacked or talking to police or medical personnel.
Jackson, however, did testify that on the evening of the attack, someone had
become physical with her and that Davis had caused her injuries. Jackson also
testified that there was a time when she had told others that Davis had not
caused her injuries, believing that it was none of their business. After the State
rested, Davis, through counsel, requested that the trial court give the jury a

stipulation or statement regarding the "pressure the State applied to the victim in this case," essentially a threat of potentially revoking her probation. Tr. Vol. IV p. 113. Upon Davis's request, the following colloquy between the parties and the trial court took place:

> [THE STATE]: Your Honor, just so we're clear, the State asked you to appoint counsel to Ms. Jackson because she had rights that she wanted – they wanted to make sure that her rights were protected regardless of what decision that she made. When I spoke with Caryn Garton, we talked about – she – what Caryn said is I'm going to tell her to tell the truth. I'm gonna advise her of the consequences of everything, but I'm going to tell her to tell the truth, that' [sic] what I'm gonna ask her to do. Um, as it relates to the OWI, I did not interfere with that at all. No one – I didn't make any phone calls, anything. All we did was file an order to transport. She was not given any benefits or privileges or anything at all for her testimony. I mean if Mr. Hanson would remember, probation was closed on Monday. So, therefore, they wouldn't have had knowledge of to file a petition. So, I think she probably had a 2:00 probation appointment today. I anticipate at some point there's going to be a petition to revoke her suspended sentence put on file. It just hasn't caught up. There have been numerous instances where someone who has been on probation and their probation officer doesn't catch it immediately, and they – somebody has to be taken back in custody. In fact, there are times, especially with an OWI, it's set for informal adjustment and then we have to then tell the probation officer to file petition to revoke their bond.
>
> THE COURT: Looking at Odyssey, a petition to revoke her bond was filed at 11:02 a.m. today.
>
> [THE STATE]: So –

THE COURT: That's public record. I just pulled that up on the public access site.[1]

[THE STATE]: Thank you. So, um, in saying that, I – I'm personally affronted by that cause it sounds like I did something that was unethical. Um, number two, um, if we talk about the fact that she's on probation, it opens the door to a prior bad act, which is her battery with a deadly weapon. And I believe that would be substantially more prejudicial than probative. So, therefore, I believe that that information should not come in front of the Jury.

THE COURT: Do you have any information there was some – I don't even know what the proper word to use is.

[DEFENSE COUNSEL]: Well – and I'm not going –

THE COURT: Unkind or influence that the State used?

[DEFENSE COUNSEL]: I'm not going full blown Giglio, I'm not accusing [the State] of – of directly doing anything. Uh, I'm simply stating that the circumstances are such that the witness, as she sat there and testified, knew she has this sort of sword of Damocles over her head. She sat down with an attorney and been advised specifically on the pros and cons of what she decides to do. And I spoke with Ms. Garton as well, and I'm in agreement, Ms. Garton gave good advice and told her you gotta tell the truth. And if you don't – if - you tell the truth this way, and if you tell the truth this way, whatever the truth is, she mapped out for her the basic scenarios that she was facing and told her the legal consequences of those scenarios, gave her good advice. I don't have any problem with that. I don't have any

_____

[1] There was discussion by defense counsel as to why Jackson was not held on a probation violation following her arrest for OWI. As the trial court pointed out, the State eventually filed a petition to revoke her bond for violating the terms of her probation.

problem with – uh, there's been no – I – I guar (sic) – I have no information that any promise was made to her. [ … ]

THE COURT: So, you want me to tell the Jury that her lawyer told her to tell the truth and there was an accident and she was allowed out of jail?

[DEFENSE COUNSEL]: No, that's not what I'm trying to say. I'm saying that it's relevant context that she had been advised of consequences so when she testifies, she testifies, uh, based on her knowledge of what could be the consequences of her testimony –

[THE STATE]: Your Honor, I specifically –

[DEFENSE COUNSEL]: - in light of her probation, but.

[THE STATE]: I specifically asked Ms. Garton what advice she gave her. And she said that I told her to tell the truth. I explained to her that it would not be okay – if he didn't do it, it would not be okay for you to get on the stand and say that he did it. You have to tell the truth. She was very clear. She went through everything and talked about very good advice. She said tell the truth no matter what. She told her to tell the truth, so.

Tr. Vol. IV pp. 117–21. The trial court declined Davis's request to admonish the jury.

[6] At the conclusion of trial, the jury found Davis guilty of Level 3 felony criminal confinement, Level 5 felony battery, and Level 5 felony domestic battery. On November 5, 2019, the trial court sentenced Davis to sixteen years for the criminal-confinement conviction, merged the battery conviction with the criminal-confinement conviction, and vacated the domestic battery conviction.

# Discussion and Decision

## I. Prosecutorial Misconduct

[7] Davis contends that the trial court failed to prevent or remedy the prosecutorial misconduct which occurred when the State allegedly threatened Jackson with a probation violation, which ultimately deprived Davis of his right to call witnesses pursuant to the Sixth Amendment of the United States Constitution. We review a claim of prosecutorial misconduct properly raised in the trial court by determining "(1) whether misconduct occurred, and if so, (2) whether the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he or she would not have been subjected otherwise." *Ryan v. State*, 9 N.E.3d 663, 667 (Ind. 2014).[2] Regarding the Sixth Amendment of the United States Constitution,

> [a] fundamental element of due process of law is the right of an accused to present witnesses in his own defense. Those witnesses must be free to testify without fear of governmental retaliation. While a trial court judge may advise a witness of his right to avoid self-incrimination, he may not do so in a threatening or browbeating manner. A prosecutor's warning of criminal charges during a personal interview with a witness improperly denies the defendant the use of that witness's testimony regardless of the

---

[2] There is some argument that Davis failed to preserve his prosecutorial-misconduct claim for appellate review. See *id*. ("To preserve a claim of prosecutorial misconduct, the defendant must—at the time the alleged misconduct occurs—request an admonishment to the jury, and if further relief is desired, move for a mistrial."). We nonetheless choose to address Davis's claim on the merits.

prosecutor's good intentions. A prosecutor may not prevent nor discourage a defense witness from testifying.

*Collins v. State*, 822 N.E.2d 214, 220 (Ind. Ct. App. 2005), *trans. denied*.

[8] Davis bases his argument on the Chief Deputy Public Defender's statement that she told Jackson that "the prosecutor is threatening her with having her probation violation if what she says is different than what she said." Tr. Vol. II p. 10. Not only is this merely the Chief Deputy Public Defender's characterization of the issue, but it also stands as an outlier to the other evidence contained in the record, which indicates that the State sought only to have Jackson testify truthfully and that she be advised of the legal consequences if she chose not to. At the October 7, 2019, status hearing, the State informed the trial court that it believed Jackson was going to recant the prior statements she made to police regarding the attack. The State's belief was not unreasonable given that Davis had attempted to call Jackson 3079 times from jail while awaiting trial, and of those calls, 696 had connected. During one call, Davis had told Jackson to "say less and stick to the script," and that "less is better." Ex. 43. Moreover, Jackson testified at trial that she had been telling others that Davis had not caused her injuries. Given its belief, the State requested that the trial court provide Jackson with counsel to advise her of the perils of testifying untruthfully, which was also reasonable given that untruthful testimony could have resulted in criminal charges for Jackson, *i.e.,* perjury or false reporting, which could result in a revocation of her probation. At trial, the State again reiterated that it only wanted Jackson to testify truthfully and sought to have

counsel appointed to "make sure that [Jackson's] rights were protected regardless of what decision that she made." Tr. Vol. IV pp. 117–18. The trial court made a similar observation, stating that "the pressure on [Jackson] was to tell the truth is my understanding." Tr. Vol. IV p. 122. We believe that the State's actions in this matter amounted to nothing more than an attempt to warn Jackson that there could be consequences if she did not testify truthfully, which we have previously concluded does not amount to prosecutorial misconduct. *See Greer v. State*, 115 N.E.3d 1287, 1291 (Ind. Ct. App. 2018) (concluding that the prosecutor was entitled to inform "the witness that there could be consequences for lying on the stand" and that "the prosecutor did not explicitly threaten [the witness] with prosecution and repeatedly reminded him that he would reminded him that he would be in trouble only if he did not tell the truth, *not* if he testified on [the Defendant's] behalf.").

[9] In support of his argument, Davis directs our attention to *Collins*. In *Collins*, during a pretrial interview, the witness informed the prosecutor that she would testify that the contraband belonged to her and not the defendant. 822 N.E.2d at 220. The prosecutor told the witness that if she testified as such, he would arrest her "the moment she stepped off the witness stand." *Id*. After the witness refused to testify, the defendant moved for a mistrial, and the prosecutor admitted to telling the witness he would have had her arrested, stating

> I and Detective Tammy Kunz on October 21st visited [the witness,] who very edgily told me essentially the conjured and coach[ed] version of events that [defendant's counsel] had worked with … [her] in his office under the suggestion that if she

took responsibility for all these actions, then she would only get—she would at most get probation. What I told her … [is that] at the conclusion of what she told me, that if she said those things under oath, on this witness stand, that I would have her arrested. Not for perjury, … [but that] she would be arrested for what she told me. And that is—possession of cocaine with a firearm— which is a Felony C—as well as possession of cocaine as a Felony D and possession of marijuana as a Misdemeanor A. That is what I told her she would be arrested for…

*Id*. at 221. We concluded that the prosecutor's conduct violated the Sixth Amendment but that it was harmless error. *Id*. at 223.

[10] That said, *Collins* is easily distinguished from the present matter. Here, there is no indication in the record that the State ever met with Jackson and told her that if her testimony differed from the statements she made to police, she would be arrested and criminally charged. Rather, knowing that Jackson was on probation, the State requested the trial court to provide Jackson with counsel to advise her of the possible consequences which could result if she testified untruthfully or made a false report. In *Collins*, the State directly threatened the witness with future legal peril if she essentially took responsibility for the defendant's actions; here, the State was attempting to provide the witness with sound legal advice in order to avoid any future legal peril. Davis has failed to establish that any prosecutorial misconduct occurred.

[11] Even assuming, *arguendo*, that prosecutorial misconduct had occurred, it could only be considered harmless error. The United States Supreme Court has held that "some constitutional errors … are so unimportant and insignificant that

they may, consistent with the Federal Constitution, be deemed harmless." *Brecht v. Abrahamson*, 507 U.S. 619, 630 (1993) (internal quotations omitted). Errors under the Sixth Amendment are subject to harmless error analysis. *Collins*, 822 N.E.2d at 221. "Error is deemed harmless when there is no substantial likelihood the error contributed to the verdict, or, in other words, that the error was unimportant." *Id*. (internal quotations omitted).

[12] Law enforcement and medical personnel testified regarding their conversations with Jackson, during which she identified Davis as her attacker and recounted the details of the attack. Law enforcement also testified to observing blood throughout the residence and furniture in disarray, indicating there had been an altercation, and locating a steak knife on the floor. Moreover, Clark's and her mother's 911 calls were played at trial, which identified Davis as the attacker. Detective Roddy also testified regarding his conversation with Clark, during which she informed him that she had witnessed Davis punching and slapping Jackson. Given this overwhelming evidence of guilt, any misconduct that occurred was harmless error.

## II. Double Jeopardy

[13] Davis contends that his convictions for Level 3 felony criminal confinement and Level 5 felony battery violate the Double Jeopardy Clause of the Indiana Constitution, which provides that "[n]o person shall be put in jeopardy twice for the same offense. *Garret v. State*, 992 N.E.2d 710, 719 (Ind. 2013).

> In *Richardson v. State*, 717 N.E.2d 32 (Ind. 1999) this Court concluded that two or more offenses are the same offense in violation of article 1, section 14 if, with respect to either the statutory elements of the challenged crimes or the actual evidence used to obtain convictions, the essential elements of one challenged offense also establish the essential elements of another challenged offense. Under the actual evidence test, we examine the actual evidence presented at trial in order to determine whether each challenged offense was established by separate and distinct facts. To find a double jeopardy violation under this test, we must conclude that there is a reasonable possibility that the evidentiary facts used by the fact-finder to establish the essential elements of one offense may also have been used to establish the essential elements of a second challenged offense. The actual evidence test is applied to all the elements of both offenses. In other words … the Indiana Double Jeopardy Clause is not violated when the evidentiary facts establishing the essential elements of one offense also establish only one or even several, but not all, of the essential elements of a second offense.

*Id.* (cleaned up). "The existence of a reasonable possibility turns on a practical assessment of whether the [fact finder] may have latched on to exactly the same facts for both convictions." *Id.* at 720 (internal quotations omitted). We evaluate the evidence from the factfinder's perspective and may consider the charging informations, jury instructions, and counsel's arguments. *Id.* Whether two convictions violate the Double Jeopardy Clause is a pure question of law, which we review *de novo*. *Grabarczyk v. State*, 772 N.E.2d 428, 432 (Ind. Ct. App. 2002).

[14]  To convict Davis of Level 3 felony criminal confinement, the State was required to prove that Davis knowingly or intentionally confined Jackson

without her consent, resulting in serious bodily injury to Jackson. Ind. Code §
35-42-3-3(a), (b)(3)(B). To convict Davis of Level 5 felony battery, the State was
required to prove that Davis knowingly or intentionally touched Jackson in a
rude, insolent, or angry manner, resulting in serious bodily injury. Ind. Code §
35-42-2-1(c)(1), (g)(1). Serious bodily injury means bodily injury that creates a
substantial risk of death or that causes serious permanent disfigurement,
unconsciousness, extreme pain, permanent or protracted loss or impairment of
the function of a bodily member or organ, or loss of a fetus. Ind. Code § 35-
31.5-2-292.

[15]     Regarding criminal confinement, the record indicates that Davis locked the
door of Jackson's residence, positioned himself on top of her, and repeatedly
beat her, which resulted in her sustaining two swollen eyes, split lips, and a
laceration on her nose, which is now permanently scarred. The record also
indicates that Jackson lost large amounts of blood and was hysterical and in
pain when medical personnel arrived. Regarding battery, the record indicates
that while on top of Jackson, Davis strangled her until she lost consciousness.
Moreover, the State's closing argument also presented these distinct facts to
support each conviction as follows:

> So to be able to find him guilty of the Criminal Confinement, the
> State will submit to you that when he was on top of her hitting
> her and caused that mark on her nose, that's the Criminal
> Confinement resulting in serious bodily injury. For the Domestic
> Battery resulting in serious bodily injury, and the Battery for that
> matter as well, and the Strangulation. When he strangled her and

> caused her to lose [consciousness,] that will support those
> charges.

Tr. Vol. IV p. 136. Davis has failed to persuade us that there is a reasonable possibility that the jury used the same evidentiary facts to convict him of both criminal confinement and battery and therefore his convictions do not violate the Double Jeopardy Clause under the Indiana Constitution.

[16] The judgment of the trial court is affirmed.

Baker, J., and Pyle, J., concur.