

I N  T H E

# Court of Appeals of Indiana

Joe Chuck Pittman,

*Appellant-Defendant*

v.

State of Indiana,

*Appellee-Plaintiff*



FILED

Apr 25 2024, 9:15 am

C L E R K
Indiana Supreme Court
Court of Appeals
and Tax Court

April 25, 2024

Court of Appeals Case No.
23A-CR-710

Appeal from the Lake Superior Court

The Honorable Natalie Bokota, Judge

Trial Court Cause No.
45G02-1903-MR-9

**Opinion by Judge Bradford**
Chief Judge Altice and Judge Felix concur.

**Bradford, Judge.**

## Case Summary

[1] On January 9, 2019, Joe Chuck Pittman and a group of cohorts committed various acts of attempted burglary, attempted robbery, and burglary. During the attempted robbery, which involved four different victims, Alayna Ortiz was shot and killed. Pittman was subsequently convicted of felony murder, three counts of Level 3 felony attempted robbery, Level 4 felony attempted burglary, and Level 4 felony burglary. On appeal, he contends that the trial court erred in denying his right to self-representation and abused its discretion in admitting evidence of gang affiliation. He also contends that his convictions violate Indiana's prohibition against double jeopardy. We affirm.

## Facts and Procedural History

[2] In early 2019, William Hawkins sold marijuana out of a house on Madison Street ("the House") in Gary. Hawkins would travel to California, purchase marijuana, and ship the marijuana to the House in vacuum sealed bags. Hawkins had several friends sell the marijuana on his behalf, including Donald Shields and Giovante Galloway. Shields lived in the House with his girlfriend, Chyanne Miller.

[3] As of January of 2019, Galloway owed Hawkins $1600.00 for marijuana that Hawkins had advanced to Galloway, and Hawkins had refused to advance Galloway any more marijuana. Knowing that Hawkins had recently mailed a shipment of marijuana to the House, Galloway reached out to his uncle, Juarez

Rogers, to see if Rogers would help Galloway break into the House to steal the marijuana. Rogers, in turn, had recruited Pittman, and the three men then met and agreed on a plan to break into the House.

[4] On January 9, 2019, Galloway, Rogers, and Pittman, together with Elrice Williams and Joshua Wright, drove to the House. They attempted to open the back door, but something near the door fell over and made a loud noise. That noise was promptly followed by the sound of gunshots coming from inside the House. The five men "scatter[ed]" but, after some time, met back up at their vehicle. Tr. Vol. V p. 36.

[5] Meanwhile, Shields had called Hawkins and asked him to pick him and Miller up and to take them to a different residence. Hawkins arrived a short time later with his girlfriend, Alayna Ortiz. Hawkins was driving Ortiz's vehicle. Miller was carrying a duffel bag when she and Shields exited the House and got into Ortiz's vehicle. Pittman and his cohorts believed that the duffel bag had contained the marijuana and money, so they followed Ortiz's vehicle.

[6] Hawkins drove to an apartment complex and parked in a spot that had a wooden post in front of it. Wright, who was driving the other vehicle, immediately pulled in behind Hawkins, blocking him in. Williams and Pittman "jump[ed] out" of their vehicle, with Williams taking the driver's side and Pittman the passenger's side. Tr. Vol. V p. 49. Both men were armed. From the back seat, Shields yelled at Hawkins to "drive," and Hawkins put the car into gear and then powered over the wooden post. Tr. Vol. IV p. 125. As

Hawkins did so, Williams fired his gun through the rear driver's side window. The bullet struck Ortiz in the head and killed her.

[7] Hawkins found local law enforcement nearby and drove to them for assistance. The five men went back to the House and completed their burglary of it. Upon returning to the House, Pittman and his cohorts ransacked the House and "grabb[ed] what they" could, including Hawkins's Xbox; two televisions, one of which was an eighty-inch television and the other was a smaller one; ammunition; and a book bag. Tr. Vol. VI p. 126. They also stole ten to fifteen pounds of leaf marijuana and 200 vape cartridges, which despite their belief that Shields and Miller had taken the drugs with them, had been left in the House after all. Galloway later informed law enforcement of what had happened and who had been involved.

[8] The State subsequently charged Pittman with felony murder, Level 2 felony attempted robbery resulting in serious bodily injury, four counts of Level 3 felony attempted armed robbery, Level 4 felony attempted burglary, and Level 4 felony burglary. The State also filed a use-of-firearm enhancement.

[9] On April 6, 2021, Pittman requested permission to represent himself at trial. During a hearing that was held the next day, Pittman's then-counsel informed the trial court that Pittman had no trust in him, he had no influence over Pittman, and there was no chance of a reconciliation of his relationship with Pittman. The trial court allowed Pittman's then-counsel to withdraw his

appearance and Pittman indicated that he wished to proceed "[p]ropria persona" and represent himself. Apr. 7 Hr. Tr. p. 10.

[10] Pittman indicated that he understood the potential penalties he was facing. He further indicated that he was "not sure" if he had ever been declared incompetent but that he had been diagnosed with depression and as being bipolar. Apr. 7 Hr. Tr. p. 14. Pittman admitted that he had been prescribed medication in jail but that he had thrown it away and had not taken it. Pittman further admitted that he had never read the Indiana Rules of Evidence or Rules of Court and could name only one potential defense at trial, *i.e.*, challenging the sufficiency of the State's evidence. Pittman indicated that he understood that he would not receive any special treatment or advice from the trial court if he represented himself.

[11] Pittman outlined his knowledge of the legal system, citing to the "Court Survival Guide" and indicated that law school was eight to twelve years. Apr. 7 Hr. Tr. p. 23. He further indicated that he wanted to represent himself because

> I feel like this case is about me and pertaining to me. So I feel like I should be the one representing me. Because there is stuff my attorney is not going to probably say for me or do for me, that he hasn't done for me, that I'd be willing to say for myself, and that I'd be willing to do for myself.

Apr. 7 Hr. Tr. p. 24. Pittman went on to state that he wanted to represent himself because

I found out what propria persona means. And like I said to you before, there's no law that requires me to have an attorney or a public defender. In fact, I am a [sic] attorney myself. I could be that…. Based off what I'm telling you, I'm pretty sure you have knowledge of propria persona or pro per…. I'm pretty sure you have those. You see what I'm saying. And like I said before, there's no law that requires me to have an attorney or a public defender.

Apr. 7 Hr. Tr. p. 25.

[12]  The trial court denied Pittman's request, finding "[b]ased on all the information that I've heard today concerning your medical status and condition, your knowledge of the law, your education, and all other matters, that you do not have the ability to intelligently and competently represent yourself." Apr. 7 Hr. Tr. p. 28. The trial court indicated that it would re-entertain Pittman's request if Pittman still wished to represent himself after a different attorney was appointed to represent him but stated

to be very honest with you, sir, I'm concerned about your ability to represent yourself considering your behavior over the time that the case has been in front of the Court, the repeated refusals to come to court, the fact that you've been prescribed medication that you are refusing to take by your own admission, you are disposing of it without notice to anyone else. These are all matters of grave concern.

Apr. 7 Hr. Tr. pp. 28–29. Pittman renewed his motion for self-representation on April 26, 2021. Following a hearing on April 28, 2021, the trial court granted Pittman's motion and appointed standby counsel.

[13]     During an August 27, 2021 pretrial conference, Pittman and the trial court

engaged in the following exchange:

> THE COURT:  All right.  So under the law, it is my duty to ask
> you some questions to make sure that you are, in fact, ready for
> trial.  So, first of all, you know, as I've told you before, that you
> are going to be held, under the law, you're held to the same
> standards as a licensed professional attorney.  Do you accept
> that, sir?
>
> THE DEFENDANT:  No, ma'am.
>
> THE COURT:  You do not.  Can you articulate or explain why?
>
> THE DEFENDANT:  Yes, ma'am.…  Well, I don't feel like I
> should be held to the same standards as a licensed attorney
> because I'm representing myself propria persona.…  Which
> allows – qualifies me to be an attorney according to the Black
> Laws Dictionary (sic).  I'm establishing my sovereign citizen
> rights in these legal matters without being mislead [sic], trapped,
> or over charged by a licensed defense attorney who would only
> bind me into the very system which is dedicated to making me
> pay.  There's no law which requires me to hire a licensed
> attorney.
>
> THE COURT:  Excuse me, Mr. Pittman.  I'm just a little bit
> confuse [sic] by the last thing you said.  I'm not asking you about
> whether you want to have an attorney represent you.  I asked you
> if you accept the state of the law which is, if you represent
> yourself as I've allowed you to do so far and found you may, do
> you accept that you are, in fact, held to same standards as a
> professional attorney?
>
> THE DEFENDANT:  And once again, I say, no.…  Because I
> said no the first time, and I say, no, because I'm not pro se.  I'm
> propria persona which is another --

THE COURT: Yes. I haven't said that you're pro se, sir. I'm asking if you accept that you're held to the same standards as a professional attorney.

THE DEFENDANT: And I keep saying, no, once again.

THE COURT: Did you want to explain further why you're saying, no, or make a further record?

THE DEFENDANT: Yes, ma'am.

THE COURT: Go ahead, sir.

****

THE DEFENDANT: Okay. I would not accept me being held to the same standards as a licensed attorney because, me representing myself as propria persona, it allows me to represent myself the way I should best proceed about the case according to my own understanding and not to a licensed attorney (sic) understanding, and I'm pretty sure you probably understand that. But if you don't, I could show you on paper.

THE COURT: Do you have any legal precedent to support that argument, meaning, a case or a statute?

THE DEFENDANT: Not at the moment I don't have one.

THE COURT: I do. It's called the case of Wright versus State which was decided on May 4, 2021, and it was an opinion of our Indiana Supreme Court, which states and held that, if you do not understand and accept that you are held to the same standards as a professional attorney, then you are not making a knowing, intelligent, and voluntary waiver of the right to counsel, and you will not be allowed to represent yourself, sir.

Therefore, as you have indicated now three times adamantly and repeatedly, you do not accept that, you are now not allowed to represent yourself.

Aug. 27 Hr. Tr. pp. 4–8 (brackets added, parentheses in original). The trial court then ordered that standby counsel "shall step in" to represent Pittman. Aug. 27 Hr. Tr. p. 8.

[14] At Pittman's and Williams's joint trial, Galloway testified that he had been introduced to Williams as "BD" and that he only knew him as "BD." Tr. Vol. V p. 24. On cross-examination, Williams challenged Galloway's identification of him, asking Galloway the following:

> Q: And you also said that the front passenger was being called BD; right?
>
> A: Yeah.
>
> Q: But everybody in the car, they were calling each other BD; weren't they?
>
> A: Yes.

Tr. Vol. V p. 101.

[15] On redirect, the State sought permission to clarify Galloway's testimony that his cohorts were referring to each other as BD with his identification of Williams as BD. Williams objected on the basis of relevance and speculation and Pittman objected on the basis of prejudice. Following an exchange

between counsel and the trial court held outside the presence of the jury, the trial court determined that

> It still goes to this witness'[s] credibility and ability to identify this one person as having that nickname, and you raised -- you raised that issue to show that it minimizes the identification, and so the State has a right to respond to that, it seems. So it will [be] allowed over objection.

Tr. Vol. V p. 123. The State then engaged Galloway in the following exchange:

> Q. Counsel was asking you about BD. Is BD also an affiliation?
>
> A. Yes.
>
> Q. What is that affiliation?
>
> A. Gang affiliation.
>
> Q. Tell the jury. What's BD stand for?
>
> A. Black Disciples.
>
> Q. So when an individual was named in the vehicle as BD, was that the name that that individual was going by that night?
>
> A. Yeah.
>
> Q. Okay. Counsel had asked you about the fact that other people were being referred to as BD. Explain that to the jury.… Were other people in the car with that affiliation, BD?
>
> A. Oh, it was just anybody affiliated with the Black Disciples, they would be called that for nicknames or for short.

Q. Sure. Who else in that car was associating and affiliating as BD?

A. Everyone, honestly, other than me and Juarez.

Q. Okay. It's the other individuals who were in the car besides you and your Uncle Juarez; is that correct?

A. Yes.

Tr. Vol. V pp. 124–25.

[16] After the jury had found Pittman guilty, the trial court entered judgments of conviction for felony murder, three counts of Level 3 felony attempted robbery (for acts committed against Hawkins, Shields, and Miller), Level 4 felony attempted burglary, and Level 4 felony burglary. The State then dismissed the use-of-firearm enhancement. The trial court sentenced Pittman to an aggregate ninety-four-year sentence. The trial court also determined that the convictions for attempted burglary and burglary were "distinct crimes and [did] not run afoul of double jeopardy." Tr. Vol. IX p. 5.

## Discussion and Decision

[17] Pittman contends that the trial court erred in denying his right to self-representation and abused its discretion in admitting evidence of gang affiliation. Pittman also contends that his convictions violate Indiana's prohibitions against double jeopardy in three respects.

# I.  The Trial Court Did Not Err in Denying Pittman's Right to Self-Representation

[18]  In discussing a defendant's right to self-representation, the Indiana Supreme Court has stated the following:

> The basis of a defendant's right to self-representation under the Sixth Amendment of the United States Constitution was articulated in *Faretta v. California*, [422 U.S. 806 (1975)].  In *Faretta*, the United States Supreme Court held that a State may not constitutionally hale a person into its criminal courts and there force a lawyer upon him, even when he insists that he wants to conduct his own defense.  The Court acknowledged that when a defendant manages his own defense, he relinquishes many of the traditional benefits associated with the right to counsel, such as an attorney's training and experience, and may even conduct his own defense ultimately to his own detriment.  Therefore, the Court declared that in order for an accused to represent himself, he must knowingly, intelligently, and voluntarily forgo these relinquished benefits.
>
> However, before waiving these benefits, a trial court must make an accused aware of the dangers and disadvantages of self-representation, so that the record will establish that he knows what he is doing and his choice is made with eyes open.  There are no prescribed talking points the court is required to include in its advisement to the defendant; it need only come to a considered determination that the defendant is making a voluntary, knowing, and intelligent waiver.
>
> In addition, although a defendant need not have the skill and experience of an attorney, he must be competent to stand trial.  That is, he must have the mental capacity to understand the proceedings.  Before claiming that his right to self-representation has been denied, a defendant must timely, clearly, and unequivocally assert that right.  If a defendant's right to self-

> representation has been denied, a new trial is warranted because
> this right is not subject to harmless error analysis.

*Osborne v. State*, 754 N.E.2d 916, 920–21 (Ind. 2001) (internal citations and quotations omitted).

[19] Pittman's challenge to the denial of his request to represent himself largely focuses on the trial court's initial denial during the April 7, 2021 hearing. However, following that initial denial, the trial court granted Pittman's renewed motion for self-representation. The trial court only revoked its decision to allow Pittman to represent himself after he had repeatedly stated that he did not accept that he would be held to the same standard as a licensed attorney during the August 27, 2021 pretrial conference. In his reply brief, Pittman claims that "whether [he] agreed is not the issue" and "whether or not [he] acknowledged the standard to which he would be held is not the same as unknowingly or unintelligently waiving the right to counsel." Appellant's Reply Br. p. 6. For its part, the State asserts that "Pittman's refusal to accept that he would be held to the same standards as an attorney if he represented himself and his belief that he could simply reject that requirement demonstrates that he did not understand the dangers and disadvantages of self-representation or what self-representation would entail." Appellee's Br. p. 23. We agree with the State.

[20] In *Wright v. State*, 168 N.E.3d 244, 259 (Ind. 2021), the Indiana Supreme Court held that before granting a request for self-representation, "a trial court must ensure the defendant knows what he is doing and his choice is made with eyes open." (Internal quotation omitted). "[T]he right of self-representation is not a

license to abuse the dignity of the courtroom, to engage in serious and obstructionist misconduct, or to avoid compliance with relevant rules of procedural and substantive law." 168 N.E.3d at 259 (internal quotation omitted). "In short, while a defendant enjoys a right to self-represent, it does not inevitably follow that such right precludes the appointment of counsel over the defendant's objection to protect the public interest in the fairness and integrity of the proceedings." *Id.* at 260 (internal quotation omitted). "And this public interest, we believe, expands or contracts in direct correlation with the severity of a potential punishment a defendant faces at trial." *Id.*

[21] Pittman was charged with numerous serious offenses, including felony murder, and faced a substantial potential punishment if found guilty. Given the nature of the case, the trial court took special care to make sure that Pittman's request to represent himself was unequivocal and had been made knowingly and intentionally. During the April 7, 2021 hearing, Pittman admitted that he had never read the Rules of Evidence or Rules of Court and could only state one possible defense, *i.e.*, that the State had failed to meet its burden of proof. Nothing in the record suggests that this had changed as of the August 27, 2021 pretrial conference. During the August 27, 2021 pretrial conference, Pittman repeatedly and explicitly refused to accept that he would be held to the same standard as a licensed attorney.

[22] In *Wright*, the Indiana Supreme Court focused on the fact that Wright had "consistently responded that he understood" that he would not receive any special treatment and would be held to the same standard as a licensed attorney

in holding that Wright had knowingly waived his rights to counsel.[1] *Id.* at 265. In this case, given Pittman's repeated refusal to accept this fact, the trial court reasonably concluded that his request to represent himself had not been "knowing" or "intelligent" as it demonstrated a lack of awareness of the law and lack of comprehension about the risk involved with self-representation. The trial court was in the best position to assess whether Pittman had knowingly and intelligently waived his right to counsel. *See Poynter v. State*, 749 N.E.2d 1122, 1128 (Ind. 2001). Based on the record before us, we cannot say that the trial court erred in denying Pittman's request for self-representation.

## II. The Trial Court Did Not Abuse its Discretion in Admitting the Evidence of Gang Affiliation

[23] "A trial court has discretion regarding the admission of evidence and its decisions are reviewed only for abuse of discretion." *Hall v. State*, 177 N.E.3d 1183, 1193 (Ind. 2021). "We will reverse only if the trial court's ruling was clearly against the logic and effect of the facts and circumstances before it and errors affect a party's substantial rights." *Id.*

[24] Pittman argues that the evidence of gang affiliation should have been excluded under Indiana Evidence Rule 404(b) which provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in

---

[1] While the Indiana Supreme Court found that Wright's waiver of his right to counsel had been made knowingly, it went on to hold that it had not been made unequivocally or intelligently. *Wright*, 168 N.E.3d at 265–68.

order to show that on a particular occasion the person acted in accordance with the character." Evidence Rule 404(b) was "designed to prevent the jury from assessing a defendant's present guilt on the basis of his past propensities, the so called 'forbidden inference.'" *Hicks v. State*, 690 N.E.2d 215, 218–19 (Ind. 1997).

> [T]he standard for assessing the admissibility of 404(b) evidence in Indiana is: (1) the court must determine that the evidence of other crimes, wrongs, or acts is relevant to a matter at issue other than the defendant's propensity to commit the charged act; and (2) the court must balance the probative value of the evidence against its prejudicial effect pursuant to Rule 403. When inquiring into relevance, the court may consider any factor it would ordinarily consider under Rule 402.

*Id.* at 221.[2]

[25] However, as the State points out, "[o]therwise inadmissible evidence may be admitted where the defendant opens the door to questioning on that evidence." *Clark v. State*, 915 N.E.2d 126, 130 (Ind. 2009). "The door may be opened when the trier of fact has been left with a false or misleading impression of the facts." *Id.*

---

[2] The State argues that Pittman waived this claim on appeal because he had objected in general terms and did not object on Evidence Rule 404(b) grounds with specificity at trial. While Pittman did not specifically mention Evidence Rule 404(b) when he objected to the admission of the challenged evidence, he argued that whatever probative value there might be in the evidence, it was outweighed because the evidence was "extremely prejudicial." Tr. Vol. V p. 122. While Pittman could have undoubtedly been more precise in making his objection, we choose to reach the merits of Pittman's contentions on this issue.

[26]     In this case, Williams and Pittman were tried in a joint trial. After Galloway identified Williams, who he had known only as "BD," as one of the participating individuals, Williams's counsel elicited testimony that three of the five occupants of the vehicle had referred to each other as "BD." The State argued both at trial and on appeal that it "was entitled to clarify why others were referred to as 'BD' and elicit testimony explaining why this did not impact Galloway's identification of Williams." Appellee's Br. p. 30. The trial court determined, and we agree, that Williams's counsel opened the door to the challenged evidence when he had attempted to discredit Galloway's identification of him by introducing evidence that multiple persons in the vehicle on the night in question had been referred to as "BD."

[27]     Moreover, we cannot say that the prejudicial effect of this evidence substantially outweighed its probative value. Williams's attempt to undermine and discredit Galloway's identification of him as "BD" created a misleading impression with the jury. The State's questions on redirect were aimed at dispelling that misleading impression. Galloway's testimony on redirect was therefore relevant and necessary to avoid a misleading impression with the jury. Furthermore, even if the prejudicial effect of the evidence could be said to have substantially outweighed its probative value, any error in admitting the evidence was at most harmless given the overwhelming independent evidence of Pittman's guilt. *See Leach v. State*, 699 N.E.2d 641, 644 (Ind. 1998) (providing that error in admitting evidence was harmless given the overwhelming independent evidence of guilt). Independent evidence identified

Pittman as having participated in the planning of the burglary; being present for the attempted burglary, attempted robbery, and burglary; and being one of the men with a firearm who had attempted to get inside Alyana's vehicle when she was shot. The trial court, therefore, did not abuse its discretion in admitting the challenged evidence.

## III. Pittman's Convictions Do Not Violate Indiana's Prohibitions Against Double Jeopardy

[28] "Substantive double jeopardy claims come in two principal varieties: (1) when a single criminal act or transaction violates a single statute but harms multiple victims, and (2) when a single criminal act or transaction violates multiple statutes with common elements and harms one or more victims." *Wadle v. State*, 151 N.E.3d 227, 247 (Ind. 2020). The Indiana Supreme Court's decision in *Powell v. State*, 151 N.E.3d 256 (Ind. 2020), implicates the former scenario and its decision in *Wadle* implicates the latter. *Id.* We review questions relating to double jeopardy de novo. *Id.* at 237.

[29] Pittman raises three separate double jeopardy arguments. First, he argues that his three convictions for Level 3 felony attempted robbery violate the prohibitions against double jeopardy as discussed in *Powell*. Second, he argues that his convictions for felony murder and Level 3 felony attempted robbery violate the prohibitions against double jeopardy as discussed in *Wadle*. Third, he argues that his convictions for Level 4 felony attempted burglary and Level 4 felony burglary violate the prohibitions against double jeopardy as discussed in *Powell*.

## A.     Pittman's Three Level 3 Felony Attempted Robbery Convictions

[30]     Pittman argues that his singular act of attempting to rob the surviving occupants of Ortiz's vehicle cannot result in three convictions under the Indiana Supreme Court's analysis in *Powell*. Again, the Supreme Court's analysis in *Powell* controls when a single criminal act violates a single statute but results in multiple injuries. 151 N.E.3d at 263.

[31]     "The analysis under *Powell*, potentially a two-step process, begins by reviewing the text of the statute to determine the appropriate unit of prosecution." *Kerner v. State*, 178 N.E.3d 1215, 1232 (Ind. Ct. App. 2021), *trans. denied*. "If the statute, whether expressly or by judicial construction, indicates a unit of prosecution, then we follow the legislature's guidance and our analysis is complete." *Powell*, 151 N.E.3d at 264. "But if the statute is ambiguous, then we proceed to the second step of our analysis." *Id.*

> Under this second step, a court must determine whether the facts—as presented in the charging instrument and as adduced at trial—indicate a single offense or whether they indicate distinguishable offenses. To answer this question, we ask whether the defendant's actions are so compressed in terms of time, place, singleness of purpose, and continuity of action as to constitute a single transaction. If the defendant's criminal acts are sufficiently distinct, then multiple convictions may stand; but if those acts are continuous and indistinguishable, a court may impose only a single conviction. Any doubt counsels against turning a single transaction into multiple offenses.

*Id.* at 264–65 (internal citations and quotations omitted).

[32]     The elements of robbery expressly require the taking—or, here, the attempted taking—of property "from another person or from the presence of another person." Ind. Code § 35-42-5-1(a). The statute creates a clear unit of prosecution, *i.e.*, the taking of property (or, as here, the attempted taking of property) from another person. Thus, in effect, "if there are two separate victims there cannot be a double jeopardy problem as to the offenses they might have in question." *Woodcock v. State*, 163 N.E.3d 863, 875 (Ind. Ct. App. 2021), *trans. denied*.

[33]     In *Kerner*, we assessed the viability of two convictions for attempted robbery under *Powell*, concluding that although two victims had been killed during the commission of the attempted robbery, the State had alleged, and the evidence had demonstrated, that the defendant had only committed one act of attempted robbery. 178 N.E.3d at 1232. We further concluded that under those facts, "[w]hile serious bodily injury to a second victim can elevate the offense, it cannot form the basis of a separate attempted robbery" conviction. *Id.* at 1232–33.

[34]     In this case, however, unlike in *Kerner*, the State did not allege that Pittman had attempted to rob one victim, but rather that Pittman had attempted to rob three separate victims, *i.e.*, Hawkins, Shields, and Miller. Galloway testified that in committing the attempted robberies, Pittman and his cohorts had intended to rob the four victims of "whatever they ha[d]." Tr. Vol. V p. 46. To the extent that Pittman asserts that he could only have been convicted of one count of attempted robbery because his actions had been committed with a singleness of

purpose and had occurred at one place and time, we disagree. In attempting to rob Hawkins, Shields, and Miller, Pittman committed three separate and distinct acts of attempted robbery.

[35] We read the plain language of the robbery statute to allow the State to properly charge multiple offenses of robbery where a defendant simultaneously attempts to take property from multiple persons. Because we read Indiana Code section 35-42-5-1(a) as creating a single unit of prosecution for each victim and the commission of the offense is complete with each individual victim, we conclude that the minimum action required to commit a new and independent violation of the statute is clear. As such, "we follow the legislature's guidance and our analysis is complete." *Powell*, 151 N.E.3d at 264. Pittman's three Level 3 felony attempted robbery convictions are therefore not contrary to Indiana law.

## B. Pittman's Level 3 Felony Attempted Robbery Convictions and His Felony Murder Conviction

[36] Pittman next argues that his conviction for felony murder and his three Level 3 felony attempted robbery convictions are contrary to the Indiana Supreme Court's analysis in *Wadle*.

> *Wadle* set forth a multi-step analysis to evaluate substantive double jeopardy claims that arise when, as here, a single criminal act implicates multiple statutes with common elements. The first step is to determine whether the statutes, either explicitly or by unmistakable implication, allow for multiple punishments. If the statutes allow for multiple punishments, there is no double jeopardy violation, and our inquiry ends. If the statutes are unclear, we apply our included-offense statutes. If either offense

is included in the other, either inherently or as charged, we then consider whether the defendant's actions are so compressed in terms of time, place, singleness of purpose, and continuity of action as to constitute a single transaction. If the facts show only a single crime, judgment may not be entered on the included offense.

*Garth v. State*, 182 N.E.3d 905, 920 (Ind. Ct. App. 2022) (internal citations and quotation omitted), *trans. denied*.

[37] The question before us is whether Pittman's three attempted robbery convictions are included offenses to his felony-murder conviction. We conclude that they are not. Both the charging information and the final jury instructions clearly establish that Pittman's felony-murder conviction is based on Ortiz's death, while his three Level 3 felony attempted robbery convictions are for him approaching Ortiz's vehicle with a firearm and attempting to rob the vehicle's three other occupants—Hawkins, Shields, and Miller. Quite simply, each of these four convictions involved a different victim. We have previously concluded that "by definition one offense cannot be either a factually or inherently included lesser offense" of another offense where "a separate victim is alleged for each offense." *Woodcock*, 163 N.E.3d at 875; *see also* Ind. Code § 35-31.5-2-168(3) (defining an "included offense" in part as an offense that "differs from the offense charged only in the respect that a less serious harm or

risk of harm *to the same person*") (emphasis added). Accordingly, Pittman's argument under Wadle fails.[3]

## C. Pittman's Convictions for Level 4 Felony Attempted Burglary and Level 4 Felony Burglary

[38] Pittman last argues that his conviction for Level 4 felony attempted burglary and his conviction for Level 4 felony burglary are also contrary to *Powell* because they were each part of a single, continuous offense. This part of the *Powell* analysis requires us to look to whether the multiple acts were "so compressed in terms of time, place, singleness of purpose, and continuity of action as to constitute a single transaction." 151 N.E.3d at 268 (internal quotation omitted).

[39] We agree with the State that the actions relating to Pittman's Level 4 felony attempted burglary conviction and his Level 4 felony burglary conviction did not constitute a single, continuous offense. Pittman's Level 4 felony attempted burglary conviction was based on his initial attempt to enter the House. At that time, the intent was to steal Hawkins's marijuana and money. The initial attempt was unsuccessful as one of the occupants of the House had fired a gun, causing Pittman and his cohorts to flee. After a while, Pittman and his cohorts

---

[3] To the extent that Pittman relies on *Kerner* in support of his claim, we reiterate that *Kerner* involved a double-jeopardy analysis under *Powell* as one charged act of attempted robbery resulted in harm to two separate victims. *See Kerner*, 178 N.E.3d at 1232–33. For the reasons stated above, *Kerner* is easily distinguished from the instant matter. Moreover, to the extent that Pittman relies on *Hendricks v. State*, 162 N.E.3d 1123, 1139–40 (Ind. Ct. App. 2021), *trans. denied*, in his reply brief, we note that *Hendricks* is easily distinguishable from the instant case because the felony-murder and conspiracy-to-commit-robbery convictions involved the same victim.

met back up at their vehicle. Once back at their vehicle Pittman and his cohorts observed Hawkins, Ortiz, Shields, and Miller leave the residence carrying a bag, in which they believed was Hawkins's marijuana and money. They would later return to the residence, with those facts giving rise to Pittman's Level 4 felony burglary conviction.

[40] After Ortiz had been shot, Pittman and his cohorts observed Ortiz's vehicle stopped with law enforcement. They then returned to and burglarized the House. While they had initially intended to steal Hawkins's marijuana and money, by the time they returned to the House, they intended to steal other items, as they believed the marijuana and money were in Ortiz's vehicle with Hawkins. In the end, Pittman and his cohorts ransacked the House and stole Hawkins's Xbox; two televisions, one of which was an eighty-inch television and the other was a smaller one; ammunition; and a book bag. They also stole ten to fifteen pounds of leaf marijuana and 200 vape cartridges, which despite their belief that Shields and Miller had taken the drugs with them, had been left in the House.

[41] We agree with the State that "Pittman and the others [had] abandoned their plan to rob Hawkins of the marijuana when they observed him with police and chose to burglarize the [House] for other property instead." Appellee's Br. p. 41. The original plan had not been to steal televisions and gaming systems, but upon returning to the house the men intended to "grab[] what they" could. Tr. Vol. VI p. 125. As the State accurately states, Pittman and his cohorts "could not have returned to the [House] with the intent to steal something they did not

believe was in the house." Appellee's Br. p. 40. The fact that they were ultimately able to steal marijuana in addition to other items does not change the fact that their intent had changed by the time they returned to the House. The attempted burglary and completed burglary, therefore, were not a single transaction as the crimes were not connected through a singleness of purpose. *See Powell*, 151 N.E.3d at 268. Pittman's convictions for Level 4 felony attempted burglary and Level 4 felony burglary did not violate the prohibitions against double jeopardy as set forth under *Powell*.[4]

[42] The judgment of the trial court is affirmed.[5]

Altice, C.J., and Felix, J., concur.

ATTORNEY FOR APPELLANT

R. Brian Woodward
Appellate Public Defender
Crown Point, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

---

[4] Although Pittman's argument in his appellant's brief was limited to *Powell*, in his reply brief, he cites to the Indiana Supreme Court's decision in *A.W. v. State*, 229 N.E.3d 1060 (Ind. 2024), in which the Court altered the *Wadle* analysis relating to inherently included offenses. Pittman cites to this case in support of his claim that the charging information supports his assertion that he and his cohorts "[c]learly … had a singleness of purpose" when they attempted burglarize and successfully burglarized the House. Appellant's Reply Br. p. 13. For the reasons stated above, we do not agree that the two separate acts "clearly" had a singleness of purpose.

[5] Our conclusions in this case regarding the admission of evidence and double jeopardy are consistent with the conclusions reached by another panel of this Court in Williams's direct appeal. *See Williams v. State,* No. 23A-CR-681, 2024 WL 1251344, at *2–6 (Ind. Ct. App. Mar. 25, 2024).

Megan M. Smith
Deputy Attorney General
Indianapolis, Indiana